**U.S. Department of Labor**    Office of the Solicitor
Washington, D.C.  20210



September 24, 2013

Elisabeth A. Shumaker, Clerk
United States Court of Appeals for the Tenth Circuit
Byron White United States Courthouse
1823 Stout Street
Denver, CO  80257

Re:    *Antelope Coal Co./Rio Tento Energy America v. Rolland E. Goodin and Director, OWCP,* Docket No. 12-9590
Third Notice of Supplemental Authority pursuant to Fed R. App. P. 28(j)
**Oral argument scheduled for September 25 at 9:00 am**

Dear Ms. Shumaker:

I write on behalf of the Director, OWCP, to advise the Court that the Department of Labor's final rule implementing the 2010 amendments to the Black Lung Benefits Act (attached) was posted for inspection at the Office of the Federal Register and on the Internet at https://www.federalregister.gov/public-inspection this morning.  The rule is scheduled to be published in the Federal Register tomorrow.  While it is not effective until October 25, 2013, it contains the Director's definitive interpretation of the Act.

The revised regulation implementing 30 U.S.C. § 921(c)(4)'s 15-year presumption, 20 C.F.R. § 718.305, is entirely consistent with the decisions below, the Director's brief in this case, and the current version of that regulation.  But it clarifies its predecessor in three ways relevant here:

- First, it clarifies that surface miners who are "regularly exposed to coal-mine dust while working" are laboring in conditions "'substantially similar' to those in an underground mine" for purposes of invoking the presumption. 20 C.F.R. § 718.305(b)(2); *see* attached at 11-15 (preamble explaining rule).

- Second, it clarifies that a liable party can rebut the presumption by disproving any element of entitlement other than total disability (which must be established to invoke it); namely, by demonstrating either (i) that the miner does not have pneumoconiosis arising out of coal mine employment or (ii) that pneumoconiosis did not cause the miner's disability.  20 C.F.R. §

718.305(d)(1); *see* attached at 15-20 (preamble explaining rule).

- Third, it clarifies that the "rule-out" standard applies only to attempts to rebut the presumption by proving that pneumoconiosis did not cause the miner's disability. 20 C.F.R. § 718.305(d)(1)(ii) (party opposing entitlement must "establish[] that *no part* of the miner's respiratory or pulmonary disability was caused by pneumoconiosis[.]"); *see* attached at 20-23 (preamble explaining rule).

This rule relates to issues discussed in Antelope Coal's opening brief (13-39) and reply brief (1-18) and the Director's response brief (27-45).

Considering the timing of this rule's release to the public, the Director would consent to supplemental briefing on the subject, if requested by the private parties.

Thank you for bringing this rule to the Court's attention.

Sincerely,

SEAN G. BAJKOWSKI
Counsel for Appellate Litigation

/s/ Rita A. Roppolo
RITA A. ROPPOLO
Attorney, U.S. Department of Labor
200 Constitution Avenue, N.W., Suite N2117
Washington, D.C.  20210
(202) 693-5664

cc:     William S. Mattingly, Esq.
        Jared L. Bramwell, Esq.

This document is scheduled to be published in the
Federal Register on 09/25/2013 and available online at
**http://federalregister.gov/a/2013-22874**, and on **FDsys.gov**

**DEPARTMENT OF LABOR**

**Office of Workers' Compensation Programs**

**20 CFR Parts 718 and 725**

**RIN 1240-AA04**

**Regulations Implementing the Byrd Amendments to the Black Lung Benefits Act:**

**Determining Coal Miners' and Survivors' Entitlement to Benefits**

**AGENCY:** Office of Workers' Compensation Programs, Labor.

**ACTION:** Final rule.

**SUMMARY:** This final rule revises the Black Lung Benefits Act (BLBA or Act)

regulations to implement amendments made by the Patient Protection and Affordable

Care Act (ACA). The ACA amended the BLBA in two ways. First, it revived a

rebuttable presumption of total disability or death due to pneumoconiosis for certain

claims. Second, it reinstituted automatic entitlement to benefits for certain eligible

survivors of coal miners whose lifetime benefit claims were awarded because they were

totally disabled due to pneumoconiosis. These regulations clarify how the statutory

presumption may be invoked and rebutted and the application and scope of the survivor-

entitlement provision. The rule also eliminates several unnecessary or obsolete

provisions.

**DATES**: This rule is effective [INSERT DATE 30 DAYS AFTER DATE OF

PUBLICATION IN THE FEDERAL REGISTER].

**FOR FURTHER INFORMATION CONTACT**: Steven Breeskin, Director, Division

of Coal Mine Workers' Compensation, Office of Workers' Compensation Programs, U.S.

Department of Labor, 200 Constitution Avenue, N.W., Suite C-3520, Washington, D.C.

20210.  Telephone: (202) 343-5904 (this is not a toll-free number).  TTY/TDD callers

may dial toll-free 1-800-877-8339 for further information.

**SUPPLEMENTARY INFORMATION**:

**I.  Background of this Rulemaking**

On March 30, 2012, the Department issued a Notice of Proposed Rulemaking

(NPRM) under the BLBA, 30 U.S.C. 901-944, proposing revised rules to implement

amendments to the BLBA made by the ACA, Pub. L. No. 111-148, 1556, 124 Stat. 119,

260 (2010), and inviting public comment.  77 FR 19456-19478 (Mar. 30, 2012).  These

amendments reinstated two BLBA entitlement provisions—Section 411(c)(4), 30 U.S.C.

921(c)(4) (the "15-year presumption") and Section 422(l), 30 U.S.C.  932(l) (survivors'

automatic entitlement provision)—that had been repealed with respect to claims filed on

or after January 1, 1982.  As a result of these amendments, a miner or survivor who files

his or her claim after January 1, 2005 may now rely on the 15-year presumption in

establishing entitlement to benefits, provided that the claim was pending on or after

March 23, 2010 and the presumption's requirements for invocation are met.  In addition,

survivors whose claims meet the effective-date requirements are entitled to benefits if the

miner was awarded disability benefits on a lifetime claim, assuming that the survivor

meets the BLBA's other conditions of entitlement (such as relationship and dependency).

The Department recounted the history of these provisions in the NPRM.  77 FR at 19456-

58. The Department also proposed revising or ceasing publication of several related rules

that are obsolete or unnecessary.   The NPRM's comment period closed May 29, 2012.

**II.  Statutory Authority**

Section 426(a) of the BLBA, 30 U.S.C. 936(a), authorizes the Secretary of Labor

to prescribe rules and regulations necessary for the administration and enforcement of the

Act.

### III.  Discussion of Significant Comments

The Department received approximately fifteen comments on the proposed

regulations.  Most of these comments focus on only a few substantive issues.  The

Department's response to the major comments is set forth below in the Section-by-

Section Explanation, along with an explanation of any changes made to the proposed

rules in response.  Some members of the public applauded the Department for eliminating

outdated or unnecessary provisions and streamlining the regulations where possible.  See

generally Executive Order 13563, 76 FR 3821 (January 18, 2011) (instructing agencies to

review "rules that may be outmoded, ineffective, insufficient, or excessively burdensome,

and to modify, streamline, expand, or repeal them.").  The public submitted no negative

comments on the revisions proposed to §§ 718.1, 718.2, 718.3(a), 718.202(a)(3),

718.301, 718.303, 718.306, Part 718 Appendix C, 725.1, 725.2, 725.101(a)(1) and (2),

725.201, and 725.418.  Accordingly, the Department is promulgating these regulations as

proposed with the technical change explained below.

The Department has made an additional technical change and replaced the term

"shall" throughout the regulatory sections revised by this final rule.  Executive Order

13563 states that regulations must be "accessible, consistent, written in plain language,

and easy to understand."  76 FR 3821. See also E.O. 12866, 58 FR 51735 (Sept. 30,

1993) ("Each agency shall draft its regulations to be simple and easy to understand, with

the goal of minimizing the potential for uncertainty and litigation arising from such

uncertainty."). To that end, the Department has removed the imprecise term "shall" in those sections it is amending and substituted "must," "must not," "will," or other situation-appropriate terms. See generally Federal Plain Language Guidelines, http://www.plainlanguage.gov/howto/guidelines; Black's Law Dictionary 1499 (9th ed. 2009) ("shall" can be read either as permissive or mandatory).

Some of the Department's rules as proposed in the NPRM used the term "shall." The final version eliminates the term from these proposed subsections: §§ 718.2(c), 718.202(a)(3), 718.305(b)(1)(iii), 718.305(b)(4), 718.305(d)(3), Part 718 Appendix C, 725.1(g), 725.309(c), 725.309(c)(1), 725.418(a), 725.418(a)(3), and 725.418(d). The final rule also makes similar technical changes to the following subsections: §§ 725.2(c), 725.101(a)(4), 725.101(a)(32)(i) through (iv), 725.101(b), 725.309(a), 725.309(c)(2) through (4), 725.309(d), 725.418(b)-(c). (All references are to regulations as designated in the final rule.) Although not included in the NPRM, the Department has revised these additional subsections to eliminate the term "shall" from all subsections of each amended regulation. No change in meaning is intended.

Section-by-Section Explanation

20 CFR 718.205 Death due to pneumoconiosis

a) Section 718.205 sets forth the criteria for establishing that a miner's death was due to pneumoconiosis. The Department proposed revising § 718.205 to: (1) clarify that some survivors need not prove the miner died due to pneumoconiosis to be entitled to benefits given the ACA's revival of Section 422(l); (2) expand the criteria to include the Section 411(c)(4) 15-year presumption of death due to pneumoconiosis for claims governed by the ACA amendments; and (3) eliminate outmoded provisions. 77 FR at

4

19459-60.  In particular, the Department proposed revising the "traumatic injury"
provision in § 718.205(c)(4) and redesignating it as § 718.205(b)(5).  Section
718.205(c)(4) currently precludes survivor entitlement where the miner's death was
caused by a traumatic injury or a medical condition unrelated to pneumoconiosis "unless
the evidence establishes that pneumoconiosis was a substantially contributing cause of
death."  20 CFR 718.205(c)(4) (2011).  To implement the 15-year presumption and
clarify that certain survivors could establish this required causal connection by
presumption, the Department proposed revising this last clause to read "unless the
claimant establishes (by proof or presumption) that pneumoconiosis was a substantially
contributing cause of death."  77 FR 19460, 19475.

　　　b)  One comment asks the Department to adopt a blanket rule that a survivor is
not entitled to benefits when the miner commits suicide.  This commenter argues that
suicide should never be compensable, even where the survivor establishes that the miner
suffered from complicated pneumoconiosis and invokes the Section 411(c)(3)
irrebuttable presumption of entitlement, 30 U.S.C. 921(c)(3).  The comment states that
allowing compensation in these circumstances is at odds with other Federal workers'
compensation statutes (including the Longshore and Harbor Workers' Compensation Act,
33 U.S.C. 901-950), most state workers' compensation systems, and public policy.  The
comment points to Benefits Review Board and Sixth Circuit case precedent holding that a
survivor cannot recover benefits when a miner commits suicide.

　　　Another comment strongly objects to this commenter, stating that survivors
should not be deprived of benefits in those tragic cases where the miner commits suicide.
This comment notes that the survivors have likely nursed the disabled miner as his

physical condition deteriorated and contends that coal mine operators should bear responsibility for the pain and psychological problems pneumoconiosis causes.

The final rule treats suicide like any other traumatic event that ends a miner's life. There is no basis in the statute or legislative history to draw a distinction for suicide. Since 1983, the regulations have explicitly recognized that pneumoconiosis might be a substantially contributing cause of a death even when the miner's death was immediately caused by a traumatic injury. When the Department first promulgated § 718.205, the regulation contained no provision addressing traumatic injury or a principal cause of death other than pneumoconiosis. But the Department noted legislative history demonstrating Congress' intent "that traditional workers' compensation principles such as those, for example, which permit a finding of eligibility where the totally disabling condition was significantly related to or aggravated by the occupational exposure be included within such regulations." 45 FR 13678, 13690 (Feb. 29, 1980) citing S. Rep. No. 209, 95th Cong., 1st Sess. 13-14 (1977). In 1983, the Department extensively revised § 718.205 to implement the 1981 Amendments to the BLBA, which restricted survivor eligibility by eliminating automatic entitlement for claims filed after 1981 and required all survivors to prove that the miner's death was due to pneumoconiosis. See generally 77 FR at 19456-57 (outlining statutory history). Based on the accompanying legislative history, the Department added § 718.205(c)(4) to clarify that a survivor could prove entitlement by showing that pneumoconiosis substantially contributed to the miner's death even when the principal cause of death was a traumatic injury or a medical condition unrelated to pneumoconiosis. 48 FR 24272, 24277-78 (May 31, 1983). Once

again the Department noted Congress' desire to "make the federal statute consistent with traditional workers' compensation principles." 48 FR at 24278.

The majority of states allow workers' compensation death benefits when an otherwise compensable injury caused an employee to "become dominated by a disturbance of the mind of such severity to override normal rational judgment" which resulted in the employee taking his or her own life. 2 John L. Gelman, Modern Workers Compensation § 115:5 (West 2013); Lex K. Larson, Larson's Workers Compensation Law §§ 38.01-38.05 (Matthew Bender, Rev. Ed. 2012); see also, e.g., Graver Tank & Mfg. Co. v. Indus. Comm'n, 399 P.2d 664, 668 (Ariz. 1965) ("where the original work-connected injuries suffered by the employee result in his becoming devoid of normal judgment and dominated by a disturbance of mind directly caused by his injury and its consequences, such as severe pain and despair, the self-inflicted injury" may be compensable); Advance Aluminum Co. v. Leslie, 869 S.W.2d 39, 41 (Ky. 1994) ("[A]n employee's suicide is compensable if (1) the employee sustained an injury which itself arose in the course of and resulted from covered employment; (2) without that injury the employee would not have developed a mental disorder of such a degree as to impair the employee's normal and rational judgment; and (3) without that mental disorder, the employee would not have committed suicide."). Contrary to the commenter's assertion, this standard—often called the "chain of causation test"—has also been applied in cases arising under the Longshore and Harbor Workers' Compensation Act, a federal workers' compensation statute. E.g., Kealoha v. Director, OWCP, 713 F.3d 521, 524-25 (9th Cir. 2013) ("Given the best-reasoned modern trend of case law, we hold that a suicide or injuries from a suicide attempt are compensable under the Longshore Act when there is a

direct and unbroken chain of causation between a compensable work-related injury and the suicide attempt."). The rule is also applied in states where suicide or attempted suicide is still a criminal offense. See, e.g., Kahle v. Plochman, Inc., 428 A.2d 913, 917 (N.J. 1981) (adopting the chain of causation rule); Petty v. Associated Transp., Inc., 173 S.E.2d 321, 329 (N.C. 1970) (same). Thus, contrary to the adverse comment, "[i]n effect, no jurisdictions recognize suicide as an intentional act that automatically breaks the chain of causation to defeat a claim for death benefits." Campbell v. Young Motor Co., 684 P.2d 1101, 1102 (Mont. 1984).

The commenter primarily relies on the Sixth Circuit's decision in Johnson v. Peabody Coal Co., 26 F.3d 618 (6th Cir. 1994), to support the view that a miner's suicide should always bar his survivors' entitlement. Johnson considered § 718.205(c)(4) in the suicide context. The court found the Act's legislative history to be silent on whether psychological injury may establish the causal link between pneumoconiosis and death. In part because the then-applicable 1981 Amendments "were designed to limit, not expand benefits," 26 F.3d at 620, the court concluded that benefits should not be paid to the survivors of a miner who commits suicide. But that important reasoning is no longer valid because the ACA amendments repealed many of the restrictions on benefits that were instituted by the 1981 Amendments and considered by the Johnson court. Accordingly, the Department does not view the Johnson decision as dispositive. Instead, compensating a miner's survivors where the miner's suicide is causally linked to pneumoconiosis is consistent with workers' compensation principles and underlying Congressional intent.

The final rule also clarifies the Department's longstanding view that suicide does not preclude entitlement once the survivor invokes the Section 411(c)(3) irrebutable presumption of entitlement by establishing that the miner suffered from complicated pneumoconiosis. This result is compelled by the presumption's plain language. The provision is simply written: "If a miner is suffering or suffered from a chronic dust disease of the lung [that is described by the statutory criteria for complicated pneumoconiosis], then there shall be an irrebuttable presumption that he is totally disabled due to pneumoconiosis or that his death was due to pneumoconiosis, or that at the time of his death he was totally disabled by pneumoconiosis[,] as the case may be." 30 U.S.C. 921(c)(3). The language of the presumption itself renders the cause of the miner's death—even a death by suicide— irrelevant to the entitlement inquiry. "[T]he presumption operates conclusively to establish entitlement to benefits." Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 11 (1976). The Supreme Court explained in upholding Section 411(c)(3) against constitutional challenge that the presumption's effect "is to grant benefits to the survivors of any miner who during his lifetime had complicated pneumoconiosis arising out of employment in the mines, regardless of whether the miner's death was caused by pneumoconiosis." Id. at 24 (emphasis added). Although the Court acknowledged that an unrelated death "can hardly be termed a 'cost' of the operator's business," it still concluded that the "clear" intent of the presumption was not to provide benefits "simply as compensation for damages due to the miner's Death, but as deferred compensation for injury suffered during the miner's lifetime as a result of his illness itself." Id. at 25. See also Gray v. SLC Coal Co., 176 F.3d 382, 386-87 (6th Cir. 1999) (agreeing with Department's view that § 718.205(c)(4) traumatic injury provision

9

does not preclude survivor of miner who committed suicide from pursuing benefits under Section 411(c)(3) presumption); <u>USX Corp. v. Director, OWCP</u>, 19 F.3d 1431 (4th Cir. 1994) (unpublished table decision) (citing <u>Usery</u> and affirming survivor's benefits award under Section 411(c)(3), notwithstanding § 718.205(c)(4), where miner's death was caused by a non-work-related tractor accident).

In sum, the final rule allows the survivors of a miner who committed suicide to prove death due to pneumoconiosis by demonstrating either that the suicide was causally linked to pneumoconiosis or by invoking the Section 411(c)(3) irrebuttable presumption of entitlement. The Department believes these changes will have little practical impact on claim adjudications given the ACA's revitalization of automatic survivors' entitlement, which also makes the cause of a miner's death irrelevant if the miner was entitled to lifetime benefits. If the miner's claim was not awarded, the Department anticipates that his survivors will be able to demonstrate a link between disease and suicide only in rare cases.

c) No further comments on this section were received and the Department has promulgated the remainder of the regulation as proposed.

<u>20 CFR  718.305 Presumption of pneumoconiosis</u>

a) Section 718.305 implements the Section 411(c)(4) 15-year presumption. This statutory section provides a rebuttable presumption of total disability or death due to pneumoconiosis if the miner "was employed for fifteen years or more in one or more underground coal mines" or in a coal mine other than an underground mine in conditions "substantially similar to conditions in an underground mine" and suffers or suffered from "a totally disabling respiratory or pulmonary impairment."  30 U.S.C. 921(c)(4).  Because

current § 718.305 describes the presumption's requirements using language largely taken verbatim from the statute and offers little additional guidance regarding how the presumption may be invoked or rebutted, the Department proposed substantial revisions to clarify the presumption's operation.  The proposed rule also eliminated obsolete provisions.

      b) <u>Invocation</u>.  Three comments object to proposed § 718.305(b)(2), which states that "[t]he conditions in a mine other than an underground mine will be considered 'substantially similar' to those in an underground mine if the miner was exposed to coal-mine dust while working there."  77 FR at 19475.  The Department explained in the preamble that under this standard, a claimant would not need to produce evidence about underground mining conditions and that it was incumbent upon the fact finder to compare the claimant's non-underground mining exposure with those conditions known to exist in underground mines.  77 FR at 19461.  The Department cited several circuit court cases, including <u>Director, OWCP v. Midland Coal Co.</u>, 855 F.2d 509, 512 (7th Cir. 1988), and Benefits Review Board cases which had adopted this approach.

      The commenters that object to this section point out that although the preamble states that the fact finder must compare the miner's non-underground mine exposure with underground mine conditions, the regulation itself only requires that a claimant demonstrate some coal-mine-dust exposure in non-underground mining.  They contend this is contrary to the statute's plain language because it does not require the claimant to prove any type of similarity between exposures in underground and non-underground work.  The comments also state that the Department should adopt an objective standard for proving substantial similarity (although no comment suggests a particular standard)

11

and that the test should take into consideration certain studies showing that non-underground miners rarely develop disabling pneumoconiosis. One comment notes that administrative law judges do not necessarily have the requisite expertise to compare an individual non-underground miner's exposure to usual conditions in underground mining. Another comment suggests that OWCP confer with the Mine Safety and Health Administration and the National Institutes of Health to develop a standard.

Two comments support proposed § 718.305(b)(2) and the adoption of the Midland Coal standard. One states that it is a common sense rule that administrative law judges have had no problem applying. The commenters argue that any rule that requires a claimant to quantify a miner's dust exposure would be impractical. The commenters also note that the potential exposure in non-underground mining is actually greater than in underground mining because no ventilation systems mitigate the exposure. These comments also disagree with the other commenters' representations that certain medical studies demonstrate non-underground miners are not at increased risk for pneumoconiosis, especially once silicosis is taken into account.

The Department has revised § 718.305(b)(2) to clarify the standard. The Department agrees with those comments that noted the proposed rule could be interpreted as allowing a "substantial similarity" finding when the miner was exposed to any coal-mine dust in non-underground coal mining. This would not satisfy the statutory standard and was not the Department's intent.

The final rule's revised language clarifies the Department's intent about how the substantial similarity analysis should be conducted. The final rule acknowledges, as the Seventh Circuit recognized in Midland Coal, a fundamental premise underlying the

12

BLBA, as demonstrated by the legislative history, i.e., that "underground mines are dusty." Midland Coal, 855 F.2d at 512.  Given that legislative fact, it is unnecessary for a claimant to prove anything about dust conditions existing at an underground mine for purposes of invoking the 15-year presumption.  Instead, the claimant need only focus on developing evidence addressing the dust conditions prevailing at the non-underground mine or mines at which the miner worked.  The objective of this evidence is to show that the miner's duties regularly exposed him to coal mine dust, and thus that the miner's work conditions approximated those at an underground mine.  The term "regularly" has been added to clarify that a demonstration of sporadic or incidental exposure is not sufficient to meet the claimant's burden.  The fact-finder simply evaluates the evidence presented, and determines whether it credibly establishes that the miner's non-underground mine working conditions regularly exposed him to coal mine dust.  If that fact is established to the fact-finder's satisfaction, the claimant has met his burden of showing substantial similarity.  And if the periods of regular exposure in non-underground mine employment (combined with any underground mine employment) total 15 years or more, the claimant will be entitled to invoke the presumption if a total respiratory or pulmonary disability is also established.  This procedure will also alleviate one commenter's concern that some administrative law judges may not be knowledgeable about conditions in underground mines.

        To the extent the comments urge the Department to adopt technical comparability criteria, such as requiring a claimant to produce scientific evidence specifically quantifying the miner's exposure to coal mine dust during non-underground mining, the Department rejects the suggestion.  Benefit claimants, who must bear the burden of

proving substantial similarity to invoke the presumption, generally do not control this type of technical information about the mines in which the miner worked.  See generally Usery, 428 U.S. at 29 (noting that "showing of the degree of dust concentration to which a miner was exposed [is] a historical fact difficult for the miner to prove.").  Instead, the coal mine operators control dust-sampling and similar information about their mines. While this information is publicly available from the Mine Safety and Health Administration for some mines, it may not be relevant or available in any particular case. Dust sampling in non-underground mines is done on a designated-position basis (e.g., bulldozer operator, driller). See generally 30 CFR 71.201 et seq.  Thus, the results may not be relevant to miners doing other jobs and certainly would not be an adequate basis for the Department to adopt an exposure rule for all non-underground miners.

Instead, the Department believes the standard should be one that may be satisfied by lay evidence addressing the individual miner's experiences.  Congress enacted the Section 411(c)(4) presumption to assist miners and their survivors in establishing entitlement to benefits, and also permitted certain claimants to prove entitlement by lay evidence.  30 U.S.C. 923(b).  Putting insurmountable hurdles in claimants' paths does not comport with that intent.  Moreover, because a claimant's dust exposure evidence will be inherently anecdotal, it would serve no purpose for the Department to develop an objective, and therefore dissimilar, benchmark of underground mine conditions for comparison purposes.  The legislative fact that underground coal mines are dusty is fully sufficient for this purpose.  Of course, nothing would preclude a coal mine operator from introducing evidence—including any technical data within its control—showing that the

14

particular miner was not regularly exposed to coal mine dust during his non-underground coal mine employment.

The Department also does not believe that reviewing current medical and scientific literature on the prevalence of pneumoconiosis in non-underground miners would be useful in promulgating this particular rule.  By explicitly making the presumption available to at least some non-underground miners, Section 411(c)(4) finds as a legislative fact that these miners can develop pneumoconiosis.  Moreover, the statute focuses the substantial similarity question on a comparison of conditions existing at the different types of mines, not on the medical question of whether certain exposures do or do not lead to pneumoconiosis.  See Midland Coal, 855 F.2d at 512 ("Congress focused specifically on dust conditions in enacting the 'substantial similarity' provision.")  The Department is not free to depart from Congress' express intent on this issue.  If the particular miner did not, in fact, suffer from pneumoconiosis, the coal mine operator will be able to rebut the presumption.

c)  Rebuttal.    The Department proposed § 718.305(d) to set out the burden of proof on the party opposing entitlement to rebut the presumption in both miners' and survivors' claims.  The proposed rebuttal standards were modeled on language contained in both the statutory presumption itself and current § 718.305(d), which were used in claims filed before January 1, 1982.  Applying the statutory limitations imposed on rebuttal, proposed § 718.305(d) provided that the party opposing entitlement could rebut the presumption in only two ways:  showing that the miner did not have pneumoconiosis or that his disability or death did not arise out of coal-mine-dust exposure.  For this second method,  proposed § 718.305(d)(1)(ii) (for miners' claims) and § 718.305(d)(2)(ii)

15

(for survivors' claims) provided that the presumption could be rebutted by proof that the miner's respiratory disability or death "did not arise in whole or in part out of dust exposure in the miner's coal mine employment." 77 FR at 19475. The Department explained in the preamble that this language had been interpreted by the courts, in both Section 411(c)(4) and the similar 20 CFR 727.203(b)(3) context, as requiring the party opposing entitlement to "rule out" coal mine employment as a cause of the miner's disabling respiratory or pulmonary impairment. 77 FR at 19463.

One commenter argues that the limitations on rebuttal set forth in Section 411(c)(4) do not apply to coal mine operators under the Usery decision. Several comments acknowledge that the "in whole or in part" standard in the proposed rule is the equivalent of the "rule-out" standard mentioned in the preamble, but express disagreement with the rule-out standard. They note that claimants who attempt to establish entitlement without benefit of the presumption must show that pneumoconiosis was a "substantially contributing cause" of disability or death, and cannot recover if pneumoconiosis was only an insignificant or "de minimis" cause of disability or death under current § 718.204(c)(1) and § 718.205(c)(2). They also contend that a "rule-out" requirement improperly imposes a different standard on operators because it requires them to establish that pneumoconiosis was not even an insignificant or de minimis cause of disability or death. One comment argues that by including the "rule-out" standard in the preamble (rather than the regulatory text), the Department has violated its duty to publish its rules for public comment. This comment contends that if the "rule-out" standard is intended to establish a party's burden of proof on rebuttal, it violates the Administrative Procedure Act (APA) as construed by the Supreme Court in Director,

OWCP v. Greenwich Collieries, 512 U.S. 267 (1994). This comment also states that if the "rule-out" standard is intended to define the legal criteria for rebuttal, it has no authoritative source and is inconsistent with the "reasonable medical certainty" standard it asserts applies in BLBA claim adjudications.

Two comments generally support the proposed rule. One states that the presumption should be strong and remarks that ensuring operators' liability for coal-mine related lung disease creates an incentive for operators to comply with dust-control standards.

The final rule adopts an approach similar to the proposed rule. But the Department has made several revisions to clarify the rebuttal provisions and to accommodate some of the concerns expressed in the comments. We explain those changes below.

Miners' claims. A miner seeking BLBA benefits is required to establish, with direct evidence or via presumption, four elements of entitlement: (1) disease: that the miner suffers from pneumoconiosis in clinical or legal form, or both; (2) disease causation: that the pneumoconiosis arose at least in part out of coal mine employment; (3) disability: that the miner has a pulmonary or respiratory impairment that prevents the performance of the miner's usual coal mine work; and (4) disability causation: that the miner's pneumoconiosis contributes to that disability. 20 CFR 725.202(d)(2); see, e.g., Morrison v. Tenn. Consol Coal Co., 644 F.3d 473, 478 (6th Cir. 2011); Lane v. Union Carbide Corp., 105 F.3d 166, 170 (4th Cir. 1997). If a miner proves the disability element by a preponderance of the evidence, then Section 411(c)(4) presumes the remaining three entitlement elements. But because the presumption is rebuttable, the

party opposing entitlement must be given an opportunity to show by a preponderance of

the evidence that the three presumed elements (disease, disease causation, and disability

causation) are not in fact present.  If the opposing party establishes that the miner does

not have a lung disease related to coal mine employment (elements one and two) or that

the miner's totally disabling respiratory or pulmonary impairment is unrelated to his

pneumoconiosis (element four), the presumption is rebutted.

The Department has revised § 718.305(d) in this final rule to more clearly reflect

that all three of the presumed elements may be rebutted.  Section 718.305(d)(1)(i)

provides that the party opposing entitlement may rebut the presumption by proving that

the miner has neither legal nor clinical pneumoconiosis, including where the miner's

clinical pneumoconiosis did not arise from covered coal mine employment (disease and

disease causation).  See Barber v. Director, OWCP, 43 F.3d 899, 901 (4th Cir. 1995)

(party rebutting Section 411(c)(4) presumption must demonstrate absence of both clinical

and legal pneumoconiosis); 77 FR at 19462-63 (same).  Section 718.305(d)(1)(ii)

provides that rebuttal may also be accomplished when the party opposing the claim

shows that no part of the miner's respiratory disability was caused by pneumoconiosis

(disability causation).  See generally Mingo Logan Coal Co. v. Owens, ___ F.3d ___,

___, 2013 WL 3929081, *4 (4th Cir. 2013) (outlining three elements available for

rebuttal under Section 411(c)(4)).

These revisions also should relieve the concern expressed in the comments that

the limitations Section 411(c)(4) places on rebuttal are not applicable to coal mine

operators.  Enacted in 1972, Section 411(c)(4) provides that "[t]he Secretary may rebut

such presumption only by establishing that (A) such miner does not, or did not, have

pneumoconiosis, or that (B) his respiratory or pulmonary impairment did not arise out of, or in connection with, employment in a coal mine."  In 1976, the Supreme Court held that "the § 411(c)(4) limitation on rebuttal evidence is inapplicable to operators."  <u>Usery</u>, 428 U.S. at 35.  Nevertheless, when the Department adopted § 718.305 in 1980, it listed the same two exclusive methods of rebuttal, but did not limit their application to the Secretary.  The explanation for the change is simple.  The 1978 amendments to the BLBA expanded the definition of "pneumoconiosis" to include what is now known as "legal pneumoconiosis," <u>i.e.</u>, any "chronic lung disease or impairment . . . arising out of coal mine employment."  20 CFR 718.201(a)(2).  This amendment rendered proof that a miner's disability resulted from a lung disease caused by coal dust exposure that was not pneumoconiosis no longer a valid method of rebuttal because every disabling lung disease caused by coal dust exposure is legal pneumoconiosis.  Thus, the scenario motivating <u>Usery's</u> discussion of the rebuttal-limiting sentence no longer exists:  the only ways that any liable party—whether a mine operator or the government—can rebut the 15-year presumption are the two set forth in the presumption, which encompass the disease, disease-causation, and disability-causation entitlement elements.  Authorities post-dating this amendment that state the coal mine operator is limited to the statutory rebuttal methods simply reflect that fact.  <u>See, e.g.</u>, <u>Rose v. Clinchfield Coal Co.</u>, 614 F.2d 936, 939 (4th Cir. 1980).

The Department does not believe that the comment's discussion of Supreme Court decisions limiting an agency's power to re-interpret statutes that have been construed by the Court as unambiguous compels the Department to limit the proposed rebuttal standards to the Secretary.  <u>See Nat'l Cable & Telecomms. Ass'n v. Brand X</u>

Internet Servs., 545 U.S. 967 (2005), United States v. Home Concrete & Supply, Inc., ---

U.S. ---, 132 S. Ct. 1836 (2012).  These cases are beside the point:  neither forbid an

agency from adopting a regulation that conflicts with a prior judicial decision when the

new regulation is compelled by a subsequent amendment to the statute.  Moreover, as

already discussed, there simply are no other facts presumed under the § 411(c)(4)

presumption that a coal mine operator could rebut.  Thus, the Department believes that

applying the § 718.305(d) rebuttal standards to all parties opposing entitlement, as

proposed, will prove more helpful to the regulated public by informing it of the ways it

can rebut the presumption.

      The Department is also not persuaded by those comments that advocate applying

the "substantially contributing cause" standard for disability causation set forth at §

718.204(c)(1) to the § 718.305(d) rebuttal standard.  The comments correctly state that

the proposed rules apply a different disability-causation standard to claims governed by

the general Part 718 criteria than those in which the miner successfully invokes the

Section 411(c)(4) presumption.  But that difference is warranted by the statutory section's

underlying intent and purpose.  Based on evidence that miners who worked for at least

fifteen years were more likely to develop pneumoconiosis, Congress chose to extend the

presumption only to those miners who worked in the mines for at least fifteen years and

who were totally disabled by respiratory or pulmonary impairments.  See generally S.

Rep. No. 92-743 at 13 (1972), reprinted in 1972 U.S.C.C.A.N. 2305, 2316-17.  Congress

adopted the presumption to "[r]elax the often insurmountable burden of proving

eligibility" these miners faced.  S. Rep. No. 92-743 at 1.  In short, Congress effectively

singled out these miners for special treatment.  Adopting a rigorous rebuttal standard in

those limited circumstances in which the opposing party cannot demonstrate the absence of coal-mine-related pneumoconiosis (and thus can only rebut by showing that the miner's disability is not related to pneumoconiosis) is consistent with Congress' approach.  See generally Consolidation Coal Co. v. Director, OWCP, 721 F.3d 789, 795 (7th Cir. 2013) (noting "[i]t is no secret that the 15-year presumption is difficult to rebut").

The Department has consistently interpreted Section 411(c)(4) as requiring the rebutting party to show that the miner's disability did not arise "in whole or in part" from coal mining.  See 20 CFR 718.305(d) (2012).  And the courts considering the rebuttal provisions have concurred with the Department's use of the "in whole or in part" standard.  See, e.g., Blakley v. Amax Coal Co., 54 F.3d 1313, 1320 (7th Cir. 1995); Bosco v. Twin Pines Coal Co., 892 F.2d 1473, 1481 (10th Cir. 1989); Rose, 614 F.2d at 939; Colley & Colley Coal Co. v. Breeding, 59 Fed. Appx. 563, 567 (4th Cir. Mar. 11, 2003) (unpub.).   The "in no part" standard the Department has adopted in the final rule is a reasonable interpretation of the statutory language and effectuates Section 411(c)(4)'s purposes.  It is intended to simplify and clarify the "in whole or in part standard."

Contrary to one commenter's suggestion, the § 718.305(d) rebuttal standards adopted by the final rule do not violate the burden of proof imposed by the APA.  As interpreted by the Supreme Court, the APA requires the proponent of a rule or order to bear the burden of persuasion by a preponderance of the evidence to prevail.  Greenwich Collieries, 512 U.S at 277-78.  The "in no part" standard does not run afoul of this holding because it is the fact that must be established and not the "degree of certainty needed to find a fact or element under the preponderance standard." Metropolitan

Stevedore Co. v. Rambo, 521 U.S. 121, 129 (1997). As the Supreme Court has explained, "the preponderance standard goes to how convincing the evidence in favor of a fact must be in comparison with the evidence against it before that fact may be found, but does not determine what facts must be proven as a substantive part of a claim or defense." Id. (citing Greenwich Collieries v. Director, OWCP, 990 F.2d 730, 736 (3d Cir. 1993)). The "in no part" standard also does not govern the level of certainty with which a medical opinion must be expressed to be considered probative evidence; the rule provides only what facts must be established to rebut the presumption. Thus, the commenter's fears that the standard requires a higher level of certainty in medical opinions than is currently required are unfounded. Moreover, contrary to the commenter's statement, a medical opinion need not be expressed with "reasonable medical certainty" to be probative of a medical fact under the BLBA. Instead, it is sufficient if the opinion is documented and constitutes a reasoned medical judgment. See, e.g., Mancia v. Director, OWCP, 130 F.3d 579, 588 (3d Cir. 1997). Thus, a party opposing entitlement may rebut the presumption when the preponderance of the evidence, including medical opinions that are documented and reasoned exercises of physicians' medical judgment, demonstrates that pneumoconiosis played no role in the miner's respiratory disability.

Survivors' claims. In the survivor's context, a claimant who establishes the invocation criteria receives a presumption that the miner died due to pneumoconiosis. This presumption encompasses the two entitlement elements in survivors' claims: disease (that the miner had clinical and legal pneumoconiosis) and death (that the miner died due to pneumoconiosis). For the reasons stated above regarding rebuttal in a miner's claim, the Department has made parallel changes to § 718.305(d)(2) in this final

rule to clarify how the presumption may be rebutted when the party opposing entitlement seeks to disprove these presumed facts.

d)  No further comments were received and the Department has promulgated the remainder of the regulation as proposed.

<u>20 CFR  725.212, 725.218, 725.222  Conditions of entitlement</u>

a)  This series of rules prescribes the conditions required for a miner's survivors to establish entitlement to benefits.  Section 725.212 applies to a miner's surviving spouse or a surviving divorced spouse, § 725.218 applies to a deceased miner's children, and § 725.222 applies to surviving parents and siblings.  The Department proposed revising these regulations to omit certain conditions of entitlement applicable only to claims filed prior to June 30, 1982, and to add new conditions of entitlement made applicable to certain claims by the ACA amendments.  Specifically, ACA Section 1556(b) amended Section 422(l) to revive automatic entitlement for survivors of miners awarded lifetime disability benefits and whose claims meet the effective date requirements of ACA Section 1556(c).  Proposed §§ 725.212(a)(3)(ii), 725.218(a)(2), and 725.222(a)(5)(ii) implement this amendment by clarifying that qualifying survivors who file a claim for survivors' benefits after January 1, 2005, that is pending on or after March 23, 2010, are not required to establish that the miner died due to pneumoconiosis.  77 FR at 19467; 19477-78.

b)  Two commenters, who submitted identical comments, object generally to the Department's construction of the statute.  They argue that the ACA restores derivative benefits to survivors only if the related miner's disability claim was filed after January 1, 2005, and pending on or after March 23, 2010.  One commenter generally supports the

Department's proposal to implement the ACA amendment restoring derivative survivors' benefits.

The Department continues to believe, as explained in the proposal (77 FR at 19467-68), that the ACA amendments apply to all claims, including survivors' claims, meeting the effective date criteria.  The plain language of Section 1556(c) states that the amendments apply to "claims filed . . . after January 1, 2005, that are pending on or after [March 23, 2010]."  Pub. L. No. 111-148, 1556(c), 124 Stat. 119, 260(c) (2010).  Nothing in the text of ACA Section 1556(c) or Section 1556(b) suggests that the amendment only applies to disability claims by miners and not to survivors' claims.  To the contrary, the most natural reading of the unqualified word "claims" in Section 1556(c) encompasses both miners' and survivors' claims.  The four courts that have considered the issue have unanimously agreed with this reading and held that the amendment restoring derivative benefits applies to survivors' claims that satisfy Section 1556(c)'s effective-date requirements even if the related miner's disability claim did not.  See Marmon Coal Co. v. Director, OWCP [Eckman], ___ F.3d ___, ___ n.3, 2013 WL 4017160, *6 n.3 (3d Cir. 2013) ("the ACA revives § 932(l)'s automatic benefits to the extent that a survivor files a claim for benefits after January 1, 2005, that is pending on or after the ACA's effective date, March 23, 2010."); U.S. Steel Mining v. Director, OWCP [Starks], 719 F.3d 1275, 1285 (11th Cir. 2013) ("Section 1556(c) does not distinguish between miners' claims and survivors' claims.  The plain meaning of § 1556(c) is that anyone—miner or survivor— who filed a claim for benefits after January 1, 2005, that remained pending on March 23, 2010, can receive the benefit of the amendments."); Vision Processing, LLC v. Groves, 705 F.3d 551, 555 (6th Cir. 2013) ("Language and context show that the 2010

amendments apply to all survivor-benefit and all miner-benefit claims filed after January 1, 2005, and pending on March 23, 2010."); West Virginia CWP Fund v. Stacy, 671 F.3d 378, 388 (4th Cir. 2011) ("Because Congress used the term 'claims' [in ACA Section 1556(c)] without any qualifying language, and because both miners and their survivors may file claims under the BLBA . . . the plain language supports the Director's position that amended § 932(l) applies to survivors' claims that comply with Section 1556(c)'s effective date requirements.").

The Department's conclusion is further informed by Section 1556(c)'s impact on non-survivor claims.  Section 1556(c)'s effective-date requirements apply not just to claims subject to revived Section 422(l) (Section 1556(b)), but also to claims subject to the revived Section 411(c)(4) 15-year presumption (Section 1556(a)).  The 15-year presumption explicitly applies to claims brought by both miners and survivors.  See 30 U.S.C. 921(c)(4).  The commenters' proposed statutory construction would create an inappropriate dichotomy:  the term "claims" in subsection (c) would mean "miners' and survivors' claims" when considering entitlement to the fifteen-year presumption under subsection (a), but only "miners' claims" when considering entitlement to derivative benefits under subsection (b).  This incongruous result violates the "basic canon of statutory construction that identical terms within an Act bear the same meaning."  Estate of Cowart v. Nicklos Drilling Co., 505 U.S. 469, 479 (1992).  Indeed, the Fourth Circuit has rejected this construction as "tortured."  Stacy, 671 F.3d at 389.

To further support their position, the commenters note that because Section 422(l) ostensibly relieves survivors of the obligation to file claims, it is illogical to use the survivor's claim filing date as the operative date for determining eligibility under Section

422(l).  The context in which Congress adopted the ACA amendments leads to a different

conclusion.  At the time Section 1556 was enacted, both miners and survivors filed

claims.  Indeed, except for the survivors of miners who had filed successful claims before

1982, the only way a survivor could obtain benefits was to file an independent claim,

even if the miner had been awarded lifetime disability benefits.  See, e.g., Hill v. Peabody

Coal Co., 94 Fed. Appx. 298, 299 (6th Cir. 2004) (unpub.).  Thus, Congress knew when

it restored derivative benefits in 2010 that independent survivors' claims were common.

See generally Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer, 515 U.S. 528, 554

(1995) (Congress is presumed to know the law, and to know how it has been

interpreted.).  Interpreted in that light, the term "claim" includes both miners' and

survivors' claims.  See Starks, 719 F.3d at 1285 ("Just because the application of the

amended § 932(l) to a claim operates to eliminate the need for that claim does not render

its application illogical or unworkable."); Stacy, 671 F.3d at 388-89 ("Although amended

§ 932(l) states that a survivor is not required to file a new claim for benefits, the

conclusion petitioner draws from this language—that the operative date for determining

eligibility cannot be the date the survivor's claim was filed—simply does not follow.");

Groves, 705 F.3d at 556 ("Section 1556(b) eliminates the requirement that survivors file

a claim before obtaining benefits; it does not prohibit such claims.").  See also B & G

Constr. Co. v. Director, OWCP [Campbell], 662 F.3d 233, 244 n.12 (3d Cir. 2011)

("[S]urely a widow seeking benefits must file something in order to receive them.  After

all, notwithstanding section 1556 a claimant might not be the miner's real widow.  But

what a widow does not have to do is establish that the miner died from

pneumoconiosis.").

The commenters also state that the proposed rule is inconsistent with how the Department interpreted the 1982 amendment to Section 422(l) eliminating derivative benefits in claims filed after 1981.  The Department then permitted derivative benefits in survivors' claims filed after 1981 so long as the related miner's disability claim was filed before 1982 and resulted in an award.  The commenters cite Pothering v. Parkson Coal Co., 861 F.2d 1321 (3d Cir. 1988), to support their view.  Pothering, which interpreted the text of the 1981 amendment, has no bearing on the meaning of Section 1556(c), which uses entirely different language.  The Department's interpretation of the 1981 amendment's use of the term "claim" as meaning only miners' claims was compelled by its particular text and legislative history, which are inapplicable to Section 1556.  As noted above, the Third Circuit itself has confirmed that the ACA's automatic entitlement provisions apply to survivors' claims filed within Section 1556's temporal limitations. Eckman, ___ F.3d at ___ n.3, 2013 WL 4017160, *6 n.3.   Other courts confronted with the Pothering argument have either specifically or implicitly rejected it.  See Starks, 719 F.3d at 1286 (rejecting Pothering argument and noting that "[i]f [the Section 1556] context does not demand a variation in the meaning of the word 'claim,' we do not know what context would.  Any other reading of the word in this context is . . . tortured.") (internal quotation marks omitted); Stacy, 671 F.3d at 388-89; Groves, 705 F.3d at 555-56.

c)  No other comments were received concerning these sections, and the Department has promulgated these regulations as proposed.

20 CFR  725.309 Additional claims; effect of a prior denial of benefits

27

a)  Section 725.309 addresses both the filing of additional claims for benefits and the effect of a prior denial.  In its notice of proposed rulemaking, the Department proposed to revise the current rule to clarify how the ACA amendment restoring Section 422(l) derivative-survivors' benefits applies when a survivor files a subsequent claim.  77 FR at 19467-68; 19478.  The proposed rule added a new paragraph, § 725.309(d)(1), to clarify that a survivor need not establish a change in a condition of entitlement if the subsequent claim meets the requirements for entitlement under amended Section 422(l).  The proposed rule also limited this exception to survivors whose prior claims were finally denied prior to March 23, 2010, i.e., before the ACA was enacted.  Once a survivor files a claim subject to the ACA and that claim is denied, any subsequent claim the survivor files is subject to the usual rules of claim preclusion set forth in proposed § 725.309(c) because the subsequent claim asserts the same cause of action as the prior denied claim.

b)  The Department received five comments asking it to abandon the proposed rule.  These commenters list several related reasons for their request.  They assert that "re-opening" denied survivors' claims violates the doctrine of res judicata, and that the ACA amendments do not create a new cause of action that would justify an exception to the doctrine or otherwise allow for re-opening of previously denied survivor claims.  The commenters also suggest that the proposed rule violates ACA Section 1556(c), which restricts application of the amendments to claims filed after January 1, 2005.  Finally, one commenter stated that the proposed rule does not clearly convey the Department's intent.

Two comments support the proposed rule.  One contends that the Department's decision to allow survivors to file subsequent claims is both compelled by the statute's remedial purposes and consistent with res judicata concepts.

28

Although the Department declines to abandon the proposed rule, the final rule has been revised to more clearly convey the Department's intent. Specifically, the final rule comprehensively describes the universe of survivors who are exempt from having to prove a change in a condition of entitlement under § 725.309(d) to pursue a subsequent claim. The proposed rule inadvertently excluded survivors whose prior claims were filed on or before January 1, 2005 that remained pending after the ACA's March 23, 2010 enactment date. As explained in the NPRM, 77 FR at 19468, and discussed in detail below, the ACA's revival of Section 422(l)'s automatic survivor entitlement provision created a new cause of action. Thus, these survivors may take advantage of the amendment by filing a subsequent claim without being hindered by the findings made in the prior claim. Accordingly, the Department has modified § 725.309(c)(1) by adding two subparagraphs (§§ 725.309(c)(1)(i)-(ii)) to provide explicit filing and pendency date requirements for the prior claim that cover all survivor claims not previously adjudicated under amended Section 422(l). With this change, the final rule also makes clear that only a survivor whose prior claim was not subject to the Section 422(l) amendment may be found entitled to benefits on a subsequent claim without having to establish a change in a condition of entitlement.

The Department is not persuaded by the comments that argue against allowing subsequent survivors' claims in these circumstances. The commenters' underlying assumption—that the Department's proposed rule re-opens previously denied claims— misperceives the rule. As the Department emphasized in its proposal, 77 FR at 19468, the ACA does not authorize reopening of previously denied claims and the proposed rule was not intended to reopen denied survivors' claims. See generally Eckman, ___ F.3d at

29

___, 2013 WL 4017160, *5 (a subsequent claim is a "new assertion[] of entitlement" that does not re-open a prior denied claim or "disregard principles of finality and res judicata"); Union Carbide Corp. v. Richards, 721 F.3d 307, 314 (4th Cir. 2013) ("[R]es judicata is not implicated by [subsequent survivors'] claims since entitlement under Section 932(l), as revived by Section 1556, does not require relitigation of the prior findings that the miners' deaths were not due to pneumoconiosis.").  Instead, consistent with the plain language of the ACA, the rule is intended to make automatic entitlement available in subsequent claims, which are entirely new assertions of entitlement distinct from any previous claim.  See Lovilia Coal Co. v. Harvey, 109 F.3d 445, 449 (8th Cir. 1997) (a "claim" under the BLBA refers to a distinct application for benefits, not an operator's general liability to a particular claimant).

     Importantly, the rule leaves the survivor's prior claim decision, and its underlying findings, in effect.  This means that the survivor will not be entitled to benefits for any period of time pre-dating the prior denial.  See 77 FR at 19468.  Consequently, the rule is consistent with the Department's longstanding recognition that, for purposes of a subsequent claim, "the correctness of [the prior decision's] legal conclusion" must be accepted in adjudicating the latter application.  Lisa Lee Mines v. Director, OWCP, 86 F.3d 1358, 1361 (4th Cir. 1996) (en banc); see also Richards, 721 F.3d at 317 & n.5 (limiting benefits period on subsequent survivor's claim to period after prior claim denial provides claimant "meaningful benefits" while also "mitigat[ing] the burden to the operator and respect[ing] the validity of the earlier denial.").

     The commenters are also incorrect that the doctrine of res judicata precludes application of section 422(l) to a survivor's subsequent claim.  Res judicata "bars a party

from suing on a claim that has already been 'litigated to a final judgment by that party . . . and precludes the assertion by such parties of any legal theory, cause of action, or defense which could have been asserted in that action.'"  Ohio Valley Envtl. Coal. v. Arcoma Coal Co. (OVEC), 556 F.3d 177, 210 (4th Cir. 2009) (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 131.10(1)(a) (3d ed. 2008).  For res judicata to bar a subsequent action, "three elements must be present: (1) a judgment on the merits in a prior suit resolving (2) claims by the same parties . . . , and (3) a subsequent suit based on the same cause of action."  OVEC, 556 F.3d at 210 (internal quotation marks omitted).  Res judicata is not applicable in this situation because a subsequent claim for automatic entitlement, arising by virtue of the ACA's 2010 amendment of the BLBA, is not the same cause of action as the original claim.  Eckman, ___ F.3d at ___, 2013 WL 4017160, *6 (holding that a survivor's "subsequent claim thus involves a different cause of action, and res judicata does not prevent [the survivor] from receiving survivors' benefits under the BLBA.").

The Department does not disagree with the notion, as expressed by one commenter, that causes of action are generally defined by a "transactional" approach.  Citing various legal precedents, the commenter states that a cause of action arises out of a common nucleus of facts and does not depend on a particular theory of recovery.  It is undoubtedly correct that "[a] claim [that] existed at the time of the first suit and 'might have been offered' in the same cause of action, . . . is barred by res judicata."  Aliff v. Joy Mfg. Co., 914 F.2d 39, 43-44 (4th Cir. 1990).  But a claim that did not exist at the time of the prior proceeding, because the new claim could not have been raised in the prior proceeding, is not so barred.  Richards, 721 F.3d at 314-15; OVEC, 556 F.3d at 210-11.

The Supreme Court explained this principle: "[w]hile [a prior] judgment precludes recovery on claims arising prior to its entry, it cannot be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case." <u>Lawlor v. Nat'l Screen Serv. Corp.</u>, 349 U.S. 322, 328 (1955).

Contrary to the commenter's contention, it is well-recognized that a statutory amendment subsequent to a first action can create a new cause of action that is not barred by res judicata, even where the new action is based on the same facts as the prior one. <u>Richards</u>, 721 F.3d at 315 ("While typically it is a new factual development that gives rise to a fresh cause of action, changes in law can also have that effect.") (internal citations omitted); <u>Alvear-Velez v. Mukasey</u>, 540 F.3d 672 (7th Cir. 2008); MOORE ET AL. at ¶ 131.22[3] ("when a new statute provides an independent basis for relief which did not exist at the time of the prior action, a second action on the new statute may be justified"). In <u>Alvear-Velez</u>, the Seventh Circuit clearly differentiated between "changes in case law [which] almost never provide a justification for instituting a new action" and "statutory changes that occur after the previous litigation has concluded [which] may justify a new action." 540 F.3d at 678. As to the former, a change in precedent provides no relief from res judicata because it merely reflects the error in the prior decision, which the aggrieved party accepted by not appealing. <u>Id.</u>; <u>Pittston Coal Group v. Sebben</u>, 488 U.S. 105, 122-23 (1988); MOORE ET AL. at ¶ 131.22[3]. By contrast, no such appellate remedy is available where a statutory barrier precludes relief. <u>Alvear-Velez</u>, 540 F.3d at 678 n.4.

Moreover, the second action is permissible where there is a statutory amendment because "the rule against claim splitting, which is one component of res judicata, is

inapplicable when a statutory change creates a course of action unavailable in the previous action." Alvear-Velez, 540 F.3d at 678. See also Maldonado v. U.S. Attorney Gen., 664 F.3d 1369, 1377 (11th Cir. 2011)(court rejected a res judicata defense to the removal of an alien on a new statutory ground in a second proceeding—although for the same offense as in a prior proceeding—explaining that "the doctrine does not say that a new claim is barred when it is based on a new theory not otherwise available at the time of the prior proceeding," and thus permitted removal based on the new statutory ground); Ljutica v. Holder, 588 F.3d 119, 127 (2d Cir. 2009) (rejecting res judicata defense to a second removal proceeding—based on the same crime as the first proceeding—because Congress created a new ground for removal subsequent to the first action); Dalombo Fontes v. Gonzales, 498 F.3d 1, 2-3 (1st Cir. 2007) (noting in dicta that res judicata does not apply when Congress amends the statutory grounds for removal, "[b]ecause a different and broader definition [of removal offenses] now controlled and that definition applied retroactively, the two proceedings did not involve the same claim or cause of action"); Marvel Characters, Inc., v. Simon, 310 F.3d 280, 287 (2d Cir. 2002) (rejecting res judicata defense because amendments to Copyright Act provided plaintiff "an entirely new and wholly separate right than the renewal right," which could not have been adjudicated in the first action).

Although one commenter states that "authorities supporting the notion that a change in law does not create a new cause of action are legion," the two cases it cites are not persuasive authority on the issue of a statutory change. The two somewhat dated decisions it cites, Hurn v. Oursler, 289 U.S. 238 (1933), and Friederichsen v. Renard, 247

U.S. 207 (1918), do not involve the doctrine of res judicta and do not address whether a change in statutory law would create a new cause of action.

Even when viewed on a factual level, a survivor's subsequent claim that meets the ACA's filing and pendency requirements is a different cause of action. The determination of whether two proceedings involve the same cause of action requires close analysis of the underlying facts in each proceeding. See, e.g., Duhaney v. Attorney Gen., 621 F.3d 340, 348 (3d Cir. 2010) ("the focus of the inquiry is whether the acts complained of were the same, whether the material facts alleged in each suit were the same, and whether the witnesses and documentation required to prove such allegations were the same") (internal quotation marks omitted). Res judicata, however, does not apply when "[a]lthough there are common elements of fact between the two . . . proceedings, the critical acts and the necessary documentation were different for the two proceedings." Id. at 349; see also Eckman, ___ F.3d at ___, 2013 WL 4017160, *6 ("The mere existence of common elements of fact between two claims does not establish the same cause of action if the critical acts and the necessary documentation were different for the two claims."); Meekins v. United Transp. Union, 946 F.2d 1054, 1058 (4th Cir. 1991) (res judicata inapplicable where a later suit "arises from events separate from those at issue in the first suit"). Moreover, it does not matter that the same ultimate remedy is available in both the first and second actions, as the cause of action springs out of the underlying facts, not the remedy. See Duhaney, 621 F.3d at 349.

Applying these principles in the context of survivors entitled under amended Section 422(l) shows that a subsequent claim is based on a different factual predicate than an original claim. In an original claim not subject to the ACA amendments, a survivor

could recover only by proving that the miner's death was due to pneumoconiosis. See 20 CFR 718.205. Resolution of this issue is based on an intensive review of medical evidence. The adjudicator is required to determine what condition or conditions resulted in the miner's death, as well as the etiology of those conditions. In contrast, the cause of the miner's death is not at issue in a survivor's subsequent claim awarded pursuant to amended Section 422(l), and medical evidence is wholly irrelevant. Rather, the survivor's entitlement is based solely on an administrative fact—whether the miner had been awarded benefits in his lifetime claim. See 30 U.S.C. 932(l). Thus, "subsequent claims arise from operative facts that are separate and distinct from those underlying [the survivors'] initial claims, and therefore constitute new causes of action." Richards, 721 F.3d at 315. Accord Eckman, ___ F.3d at ___, 2013 WL 4017160, *6 ("material facts alleged" in prior and subsequent survivor's claims were different; "the subsequent claim thus involves a different cause of action" not barred by res judicata).

　　　　Precluding subsequent claims of survivors in these circumstances would not further the purposes of the res judicata doctrine in any event. "[R]es judicata and collateral estoppel relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." Allen v. McCurry, 449 U.S. 90, 94 (1980); see generally 18 WRIGHT, MILLER & COOPER, FEDERAL PRACTICE AND PROCEDURE § 4403 (2d ed. 2002). Where subsequent claims are based on automatic entitlement, there will be little need for factual development, and most such claims can be decided in summary fashion without protracted litigation or the expenditure of significant judicial resources. Res judicata

should be used as a shield against vexatious (harassing) lawsuits or to conserve resources, not as a sword to defeat plainly meritorious claims.

Furthermore, the danger of inconsistent decisions between original and subsequent claims is absent because the subsequent claim represents a different cause of action. In fact, the danger of inconsistency lies in the other direction. If res judicata bars survivors' subsequent claims, there would be different results for similarly situated survivors who satisfy the ACA requirements based solely on the fact that one previously failed to prove a fact (death due to pneumoconiosis) that is now wholly irrelevant. See C.I.R. v. Sunnen, 333 U.S. 591, 599 (1948) (where revenue laws changed following original litigation, expressing concern that collateral estoppel will result in unequal treatment of taxpayers in same class). In short, there is no compelling reason why the doctrine of res judicata should be applied in situations covered by the rule.

The commenters' assertion that the rule circumvents the ACA's 2005 bar date is also without foundation. The rule applies only to survivors' claims filed after January 1, 2005 and pending on or after the ACA's enactment date. It is thus fully consistent with the ACA's plain language, which makes automatic entitlement applicable to all qualifying survivors' claims, both original and subsequent. It states, without qualification, that the amendments to the BLBA "apply with respect to claims filed . . . after January 1, 2005, that are pending on or after [March 23, 2010]." Pub. L. 111-148, § 1556(c) (2010) (emphasis added). This provision makes no distinction between miners' and survivors' claims, or between original and subsequent claims. Rather, as the Fourth Circuit has held, "the plain language of [Section 1556(c)] requires that amended § 932(l) apply to all claims [that satisfy Section 1556's time limitations]." Stacy, 671 F.3d at 388

36

(emphasis in original).  See also Groves, 705 F.3d at 555-56.  Thus, "the statutory text

supports [the] position that amended Section 932(l) applies to all claims that comply with

Section 1556(c)'s time limitations, including subsequent claims."  Richards, 721 F.3d at

314.  Accord Eckman, ___ F.3d at ___, 2013 WL 4017160, *5 (Section 1556(c)'s plain

language "encompasses" subsequent survivor claims).

Along the same lines, one commenter points to Senator Byrd's post-enactment

statement that the ACA amendments will apply to "all claims that will be filed

henceforth, including many claims filed by miners whose prior claims were denied, or by

widows who never filed for benefits following the death of a husband" as evidence that

amended Section 422(l) is not intended to apply to subsequent claims filed by survivors.

See 156 Cong. Rec. S2083 (daily ed. March 25, 2010).  The commenter has

misinterpreted the passage.  Even if considered persuasive authority, see Starks, 719 F.3d

at 1283 n.9 (stating that Senator Byrd's post-enactment statement is not "legitimate

legislative history"), the Senator's statement is clearly intended simply to provide

illustrative examples of groups who could potentially benefit from the ACA.  See

Richards, 721 F.3d at 316 (Senator Byrd's "description of the scope of the statute as

'including' certain types of claims connotes that his selected examples were intended to

be illustrative of the amendment's reach, not exhaustive.").  Senator Byrd was not

limiting the universe of claims affected by the ACA only to miners' subsequent claims or

survivors' first filings.  Indeed, such a reading would lead to an absurd result since it

would exclude miners who are first-time filers from accessing the revived 15-year

presumption provided under Section 1556(a).  Eckman, ___ F.3d at ___, 2013 WL

4017160, *4 (concluding that Senator Byrd's list is not necessarily "exhaustive" and

pointing out that the list "does not include the largest class of potential claims: original claims filed by miners, either pending or filed henceforth.").

One comment argues that the application of Section 1556 to survivors' subsequent claims likely violates the constitutional separation-of-powers principle, at least where the survivor's prior claim was finally decided by a United States Court of Appeals. The commenter relies on <u>Plaut v. Spendthrift Farm, Inc.</u>, 514 U.S. 211 (1995) in support. Striking down a Security and Exchange Act statutory amendment that allowed plaintiffs to reinstate certain suits that had already been finally dismissed as time-barred, <u>Plaut</u> held that Article III of the Constitution established a "judicial department," with "the power, not merely to rule on cases, but to <u>decide</u> them, subject to review only by superior courts . . . —with an understanding . . . that a 'judgment conclusively resolves the case' because '[the judiciary] render[s] dispositive judgments.'" 514 U.S. at 218-19 (quoting Easterbrook, Presidential Review, 40 Case W. Res. L. Rev. 905, 926 (1990)).

<u>Plaut</u> and the separation-of-powers principle have no relevance with respect to ACA Section 1556 and proposed § 725.309. Unlike the statute at issue in <u>Plaut</u>, Section 1556 and the rule implementing it do not require the reopening of final judicial decisions. Rather, Section 1556 changed the underlying substantive law, thereby creating a new cause of action that applies only to claims pending on or after its enactment date (March 23, 2010). <u>See, e.g.</u>, <u>In re Swanson</u>, 540 F.3d 1368, 1378-79 (Fed. Cir. 2008) (rejecting separation-of-powers challenge to reexamination of patent previously upheld by court, as two examinations were "differing proceedings with different evidentiary standards"). Far from allowing a legislative veto of a prior judicial determination, Section 1556 and the

proposed rule give "full credit" to prior claim denial.  <u>Buck Creek Coal Co. v. Sexton</u>,

706 F.3d 756, 759-60 (6th Cir. 2013) (quoting <u>U.S. Steel Mining Co., LLC, v. Director,</u>

<u>OWCP</u>, 386 F.3d 977, 990 (11th Cir. 2004)).  The rules governing the date from which

benefits are payable—including those payable on subsequent survivor claims—evidence

this principle because no benefits are payable "for any period prior to the date upon

which the order denying the prior claim became final." 20 CFR 725.309(d)(5) (2012).

c)  No other comments on this section were received and the Department has

promulgated the rule as proposed.

## IV.  Information Collection Requirements (Subject to the Paperwork Reduction Act) Imposed under the Proposed Rule

This rulemaking imposes no new collections of information.

## V.  Executive Orders 12866 and 13563 (Regulatory Planning and Review)

Executive Orders 12866 and 13563 direct agencies to assess all costs and benefits

of available regulatory alternatives and, if regulation is necessary, to select regulatory

approaches that maximize net benefits (including potential economic, environmental,

public health and safety effects, distributive impacts, and equity).  E.O. 13563

emphasizes the importance of quantifying both costs and benefits, of reducing costs, of

harmonizing rules, and of promoting flexibility.  It also instructs agencies to review

"rules that may be outmoded, ineffective, insufficient, or excessively burdensome, and to

modify, streamline, expand, or repeal them."  In accordance with this Executive Order,

the Department has proposed certain changes to these rules not otherwise required to

implement the ACA's statutory amendments.

These final rules are consistent with the statutory mandate, reflecting the policy

choices made by Congress in adopting the ACA amendments.  Those choices reflect

Congress' rational decision "to spread the costs of the employees' disabilities to those

who have profited from the fruits of their labor—the operators and the coal consumers."

Stacy, 671 F.3d at 383 (quoting Usery, 428 U.S. at 18)).  In restoring Section 411(c)(4),

"Congress decided to ease the path to recovery for claimants who could prove at least 15

years of coal mine employment and a totally disabling pulmonary impairment," thus

giving miners and their survivors "a better shot at obtaining benefits."  Keene v.

Consolidation Coal Co., 645 F.3d 844, 849 (7th Cir. 2011).  And in restoring Section

422(l), Congress made "a legislative choice to compensate a miner's dependents for the

suffering they endured due to the miner's pneumoconiosis or as a means to provide a

miner with peace of mind that his dependents will continue to receive benefits after his

death."  Campbell, 662 F.3d at 258.  The rules faithfully implement these Congressional

directives.

Although additional expenditures associated with these rules primarily flow from

the statutory amendments themselves rather than the rules, the Department has evaluated

the financial impact of the amendments' application on coal mine operators, and in

particular those classified as small businesses, as set forth in the NPRM.  See 77 FR at

19470-74.  Coal mine operators' outlays for the workers' compensation insurance

necessary to secure the payment of any benefits resulting from the amendments will

likely increase, at least in the short run.  Self-insured operators may also be required to

pay out more in compensation to entitled miners and survivors.

These operator expenditures are transfer payments as defined by OMB Circular

A-4 (i.e., payments from one group to another that do not affect the total resources

available to society).  To estimate additional workers' compensation insurance premiums

that may result from the ACA amendments, the Department projected new claim filings, award rates and associated insurance premiums both with and without the amendments for the ten-year period 2010 through 2019.  Based on the projected differences, the Department estimates that annualized industry insurance premiums will increase $35 million over this ten-year period as a result of the ACA amendments.  This figure likely overstates the premium increase because it is based on two important assumptions designed to consider a maximum-impact scenario:  the estimates assume that all coal mine operators purchase commercial workers' compensation insurance rather than self-insuring, and the insurance rates used are based on the higher rates charged by assigned-risk plans rather than the lower rates generally available in the voluntary market.  The Department's estimate is explained more fully in the Regulatory Flexibility Act discussion below.

Transfers also occur between insurance carriers or self-insured coal mine operators and benefit recipients.  These transfers take the form of benefit payments.   The amount of benefits payable on any given award depends upon a variety of factors, including the benefit recipient's identity, the length of the recipient's life, and whether the recipient has any eligible dependents for whom the basic benefit amount may be augmented.  See generally 20 CFR 725.202-725.228; 725.520 (2012).

For example, in FY 2010, the Department oversaw 28,671 active Part C BLBA claims with income and medical benefit disbursements of approximately $238 million.  This translates into an annual benefit rate of $8,316 per claim, or an average monthly benefit of $693.  Of the total active claims in 2010 payable by coal mine operators and their insurance carriers, an estimated 156 were new awards resulting from the ACA

amendments, translating into approximately $1.3 million in additional income and medical benefit disbursements in the first year. Accordingly, the Department's predicted 425 new awards in responsible operator claims for 2011 equates to an estimated $3.5 million increase in benefit disbursements for the first year.

Payments from the Black Lung Disability Trust Fund will also increase due to a small number of claims awarded under the ACA amendments and for which no coal mine operator may be held liable. The Department estimates that Trust Fund benefit payments will increase a total of approximately $48.3 million over the 10-year period from 2010-2019. Despite this amendment-related increase, Trust Fund benefit payments as a whole are decreasing annually. The majority of the Trust Fund's liabilities stem from earlier days of the black lung program, when the Trust Fund bore liability for a much higher percentage of awarded claims. Trust Fund payments cease when these benefit recipients pass away. As a result, the Trust Fund's expenditures continue to decrease each year.

Claimants who obtain benefits under the ACA amendments will gain a variety of advantages that are difficult to quantify in monetary terms. A disabled miner "has suffered in at least two ways: His health is impaired, and he has been rendered unable to perform the kind of work to which he has adapted himself." Usery, 428 U.S. at 21. Income disbursements give these miners some financial relief and provide a modicum of compensation for the health impairment the miners suffered in working to meet the Nation's energy needs. Medical treatment benefits provide health care to miners for the injury caused by their occupationally acquired pulmonary diseases and disabilities so as to maximize both their longevity and quality of life. Both income and medical benefits alleviate drains on public assistance resources. And miners awarded benefits under the

ACA amendments may also rest assured that their dependent survivors will not be left wholly without financial support.

In exchange, coal mine operators continue to be protected from common law tort actions that could otherwise be brought by these miners or their survivors for pneumoconiosis arising from the miner's employment and related disabilities or death. See 33 U.S.C. 905(a), incorporated by 30 U.S.C. 932(a). And because the monthly benefit amounts payable are fixed by statute, compensation costs are predictable and feasible for insurers to cover at an affordable rate. This predictability also allows coal mine operators to pass their costs for insurance (or benefits if self-insured) on to consumers.

From a program-administration viewpoint, the Department will realize some cost savings from the ACA amendment restoring Section 422(l)'s automatic entitlement for survivors. Before the amendment, the Department had to develop each survivor's claim, including obtaining relevant medical evidence, evaluating that evidence, and issuing a detailed decision adjudicating whether the miner's death was due to pneumoconiosis. That administrative work, and the costs associated with it, is no longer necessary where the survivor is entitled under Section 422(l). Instead, the regulations adopt a streamlined process for those cases that eliminates most evidentiary development and evaluation. This process has the dual benefit of delivering compensation to entitled survivors more quickly and reducing the costs associated with that delivery.

The Department received only two comments on its economic analysis of the impact of the ACA amendments and the proposed rules. The Department's response to those two comments is included in the Regulatory Flexibility Act section below.

The Office of Information and Regulatory Affairs of the Office of Management and Budget has determined that the Department's rule represents a "significant regulatory action" under Section 3(f)(4) of Executive Order 12866 and has reviewed the rule.

## VI.  Small Business Regulatory Enforcement Fairness Act of 1996

As required by Congress under the Small Business Regulatory Enforcement Fairness Act of 1996, enacted as Title II of Public Law 104-121, 201-253, 110 Stat. 847, 857 (1996), the Department will report promulgation of this rule to both Houses of the Congress and to the Comptroller General prior to its effective date.  The report will state that the rule is not a "major rule" as defined under 5 U.S.C. 804(2).

## VII.  Unfunded Mandates Reform Act of 1995

Title II of the Unfunded Mandates Reform Act of 1995, 2 U.S.C. 1531 et seq., directs agencies to assess the effects of Federal Regulatory Actions on State, local, and tribal governments, and the private sector, "other than to the extent that such regulations incorporate requirements specifically set forth in law."  2 U.S.C. 1531.  For purposes of the Unfunded Mandates Reform Act, this rule does not include any Federal mandate that may result in increased expenditures by State, local, tribal governments, or increased expenditures by the private sector of more than $100,000,000.

## VIII.  Regulatory Flexibility Act and Executive Order 13272 (Proper Consideration of Small Entities in Agency Rulemaking)

The Regulatory Flexibility Act of 1980, as amended, 5 U.S.C. 601 et seq., (RFA), requires an agency to prepare an initial regulatory flexibility analysis describing the proposed rule's impact on small entities.  5 U.S.C. 603.  The RFA also requires agencies to prepare a final regulatory flexibility analysis when promulgating the final rule.  5

44

U.S.C. 604.  In either instance, the RFA does not require a regulatory flexibility analysis if the agency certifies that the proposed or final rule will not have "a significant economic impact on a substantial number of small entities" and provides the factual basis for the certification.  5 U.S.C. 605.  The Department has determined that a final regulatory flexibility analysis is not required for this rulemaking.

The Department conducted an initial regulatory flexibility analysis (IRFA) prior to publishing the proposed rule, informed the public how to obtain a copy of the complete analysis, summarized the analysis in the preamble to the proposed rule, and asked for public comment on all aspects of the costs and benefits of the proposed rule, particularly with respect to impacts on small businesses.  77 FR at 19471-74.  The Department surveyed the industry and determined that virtually all coal mine operators in the United States fall within the Small Business Administration's definition of a small business.  77 FR at 19471-72.  Even though the statutory amendments themselves, rather than the rules implementing them, account for most, if not all, of the additional costs imposed on the coal mining industry, the Department estimated the maximum financial impact that might result from the amendments and rules by evaluating potential increased costs to purchase workers' compensation insurance.  See 30 U.S.C. 933 (requiring all coal mine operators to either purchase commercial workers' compensation insurance or qualify as a self-insurer to insure covered workers).  The Department determined that the ACA amendments and the implementing rules would impose an annualized cost on the industry of $35 million—or only one-tenth of one percent of average annual industry revenues— over the ten years from 2010 to 2019, with decreasing costs thereafter.  77 FR at 19473.

The Department noted that these estimates likely overstated the actual cost impact and were transitory in nature.  77 FR at 19471-73.

One comment generally states that the Department's economic analysis is opaque, unsupported by data or analysis, and lacks source citations for such data and analysis necessary to allow it to adequately review the Department's conclusions.  The comment also believes the Department's analysis was overly dismissive given the prospect of reopening thousands of previously denied survivors' claims and allowing re-filing of an unknown number of denied miners' claims.  Another comment questions how the Department calculated the number of survivors (and the resulting benefits payable) who would be automatically entitled to benefits under amended Section 422(l).  This comment was made in the context of the Department's construction of subsequent survivor claims.

The Department believes its economic analysis was complete.  The Department prepared a fully documented and explained IRFA that cited both internal and external data sources, and made the IRFA available to the public through the internet and by individual request.  77 FR at 19471.  One comment grossly overstates the potential impact of subsequent survivors' claims liability on the costs associated with the amendments and the rule.  In the NPRM, the Department estimated that out of a pool of 445 potential survivors in this category, only 317 might file subsequent claims to assert entitlement under amended Section 422(l).  77 FR at 19473-74.  Actual experience has shown that number to be far lower.  To date, only 143 survivors have filed subsequent claims seeking benefits under amended Section 422(l).

Moreover, as the Department noted in the NPRM, the financial impact of revised § 725.309 on coal mine operators is mitigated in two ways.  77 at FR 19474.  First, the

46

survivors in question would not be entitled to benefits for the period prior to the day on which the prior denial became final.  Second, an operator who ensures its BLBA liabilities with commercial insurance will not incur any additional costs because it has already purchased the insurance necessary to cover the survivor's claim.  For these reasons, the Department does not believe that allowing re-filing survivors to receive benefits under amended Section 422(l) imposes significant hardships on small coal mine businesses.

Significantly, no commenter or interested small business brought forth any information that contradicts the Department's conclusions in the IRFA, despite the Department's specific request for comments about adverse effects on small businesses.  For instance, no one submitted documentation detailing actual experience with either increased workers' compensation insurance premium rates or self-insurance expenses since enactment of the ACA amendments in 2010.  Nor did any comment allege that such increases have occurred.  The Department therefore has no reason to conclude that its cost estimates set forth in the IRFA are understated or that these businesses will incur significant adverse financial impacts.

Thus, although most coal mine operators are small businesses, the Department does not believe that an estimated annualized cost imposed for complying with the ACA amendments, as implemented by these regulations, amounting to at most one-tenth of one percent of industry revenues is a significant economic impact.  The Department therefore certifies that this final rule will not have significant economic impact on a substantial number of small entities.  Accordingly, it has not prepared a final regulatory impact

analysis.  The Department has provided the Chief Counsel for Advocacy of the Small

Business Administration with a copy of this certification.  See 5 U.S.C. 605.

## IX.  Executive Order 13132 (Federalism)

The Department has reviewed this final rule in accordance with Executive Order

13132 regarding federalism, and has determined that it does not have "federalism

implications."  E.O. 13132, 64 FR 43255 (Aug. 4, 1999).  The final rule will not "have

substantial direct effects on the States, on the relationship between the national

government and the States, or on the distribution of power and responsibilities among the

various levels of government."  Id.

## X.  Executive Order 12988 (Civil Justice Reform)

The final rule meets the applicable standards in Sections 3(a) and 3(b)(2) of

Executive Order 12988, Civil Justice Reform, to minimize litigation, eliminate

ambiguity, and reduce burden.

## XI.  Congressional Review Act

The final rule is not a "major rule" as defined in the Congressional Review Act, 5

U.S.C.  801 et seq.  This rule will not result in an annual effect on the economy of

$100,000,000 or more; a major increase in costs or prices for consumers, individual

industries, Federal, State or local government agencies, or geographic regions; or

significant adverse effects on competition, employment, investment, productivity,

innovation, or on the ability of United States-based enterprises to compete with foreign-

based enterprises in domestic and export markets.

**List of Subjects in 20 CFR Parts 718 and 725**

Total Disability due to pneumoconiosis; coal miners' entitlement to benefits; survivors' entitlement to benefits.

For the reasons set forth in the preamble, the Department of Labor amends 20 CFR parts 718 and 725 as follows:

## PART 718—STANDARDS FOR DETERMINING COAL MINERS' TOTAL DISABILITY OR DEATH DUE TO PNEUMOCONIOSIS

1.  The authority citation for part 718 is revised to read as follows:

**Authority**:  5 U.S.C. 301; Reorganization Plan No. 6 of 1950, 15 FR 3174; 30 U.S.C.  901 et seq., 902(f), 934, 936; 33 U.S.C. 901 et seq.; 42 U.S.C. 405; Secretary's Order 10-2009, 74 FR 58834.

2.  Revise § 718.1 to read as follows:

## § 718.1  Statutory provisions.

Section 402(f) of the Act authorizes the Secretary of Labor to establish criteria for determining total disability or death due to pneumoconiosis to be applied in the processing and adjudication of claims filed under Part C of the Act. Section 402(f) further authorizes the Secretary of Labor, in consultation with the National Institute for Occupational Safety and Health, to establish criteria for all appropriate medical tests administered in connection with a claim for benefits.  Section 413(b) of the Act authorizes the Secretary of Labor to establish criteria for the techniques used to take chest roentgenograms (x-rays) in connection with a claim for benefits under the Act.

3.  Revise § 718.2 to read as follows:

## § 718.2  Applicability of this part.

(a) With the exception of the second sentence of § 718.204(a), this part is applicable to the adjudication of all claims filed on or after June 30, 1982 under Part C of

49

the Act.  It provides standards for establishing entitlement to benefits under the Act and describes the criteria for the development of medical evidence used in establishing such entitlement. The second sentence of § 718.204(a) is applicable to the adjudication of all claims filed after January 19, 2001.

(b) Publication of certain provisions or parts of certain provisions that apply only to claims filed prior to June 30, 1982, or to claims subject to Section 435 of the Act, has been discontinued because those provisions affect an increasingly smaller number of claims.  The version of Part 718 set forth in 20 CFR, parts 500 to end, edition revised as of April 1, 2010, applies to the adjudication of all claims filed prior to June 30, 1982, as appropriate.

(c) The provisions of this part must, to the extent appropriate, be construed together in the adjudication of claims.

4.  In § 718.3, revise paragraph (a) to read as follows:

**§ 718.3  Scope and intent of this part.**

(a) This part sets forth the standards to be applied in determining whether a coal miner is or was totally disabled due to pneumoconiosis or died due to pneumoconiosis. It also specifies the procedures and requirements to be followed in conducting medical examinations and in administering various tests relevant to such determinations.

* * * * *

5.  In § 718.202, revise paragraph (a)(3) to read as follows:

**§ 718.202  Determining the existence of pneumoconiosis.**

(a) * * *

(3) If the presumptions described in § 718.304 or § 718.305 are applicable, it must be presumed that the miner is or was suffering from pneumoconiosis.

* * * * *

6.  Revise § 718.205 to read as follows:

**§ 718.205   Death due to pneumoconiosis.**

(a)  Benefits are provided to eligible survivors of a miner whose death was due to pneumoconiosis.  In order to receive benefits based on a showing of death due to pneumoconiosis, a claimant must prove that:

(1) The miner had pneumoconiosis (see § 718.202);

(2) The miner's pneumoconiosis arose out of coal mine employment (see § 718.203); and

(3)  The miner's death was due to pneumoconiosis as provided by this section.

(b)  Death will be considered to be due to pneumoconiosis if any of the following criteria is met:

(1)  Where competent medical evidence establishes that pneumoconiosis was the cause of the miner's death, or

(2)  Where pneumoconiosis was a substantially contributing cause or factor leading to the miner's death or where the death was caused by complications of pneumoconiosis, or

(3)  Where the presumption set forth at § 718.304 is applicable, or

(4)  For survivors' claims filed after January 1, 2005, and pending on or after March 23, 2010, where the presumption at § 718.305 is invoked and not rebutted.

(5)  However, except where the § 718.304 presumption is invoked, survivors are not eligible for benefits where the miner's death was caused by a traumatic injury (including suicide) or the principal cause of death was a medical condition not related to pneumoconiosis, unless the claimant establishes (by proof or presumption) that pneumoconiosis was a substantially contributing cause of death.

(6)  Pneumoconiosis is a "substantially contributing cause" of a miner's death if it hastens the miner's death.

7.  Revise § 718.301 to read as follows:

**§ 718.301  Establishing length of employment as a miner.**

The presumptions set forth in §§ 718.302 and 718.305 apply only if a miner worked in one or more coal mines for the number of years required to invoke the presumption. The length of the miner's coal mine work history must be computed as provided by 20 CFR 725.101(a)(32).

**§ 718.303  [Removed and Reserved]**

8.  Remove and reserve § 718.303.

9.  Revise § 718.305 to read as follows:

**§ 718.305  Presumption of pneumoconiosis.**

(a)  Applicability.  This section applies to all claims filed after January 1, 2005, and pending on or after March 23, 2010.

(b)  Invocation. (1)  The claimant may invoke the presumption by establishing that—

(i)  The miner engaged in coal-mine employment for fifteen years, either in one or more underground coal mines, or in coal mines other than underground mines in

conditions substantially similar to those in underground mines, or in any combination thereof; and

(ii)  The miner or survivor cannot establish entitlement under § 718.304 by means of chest x-ray evidence; and

(iii)  The miner has, or had at the time of his death, a totally disabling respiratory or pulmonary impairment established pursuant to § 718.204, except that § 718.204(d) does not apply.

(2)  The conditions in a mine other than an underground mine will be considered "substantially similar" to those in an underground mine if the claimant demonstrates that the miner was regularly exposed to coal-mine dust while working there.

(3)  In a claim involving a living miner, a miner's affidavit or testimony, or a spouse's affidavit or testimony, may not be used by itself to establish the existence of a totally disabling respiratory or pulmonary impairment.

(4)  In the case of a deceased miner, affidavits (or equivalent sworn testimony) from persons knowledgeable of the miner's physical condition must be considered sufficient to establish total disability due to a respiratory or pulmonary impairment if no medical or other relevant evidence exists which addresses the miner's pulmonary or respiratory condition; however, such a determination must not be based solely upon the affidavits or testimony of any person who would be eligible for benefits (including augmented benefits) if the claim were approved.

(c)  <u>Facts presumed</u>.  Once invoked, there will be rebuttable presumption—

(1) In a miner's claim, that the miner is totally disabled due to pneumoconiosis, or was totally disabled due to pneumoconiosis at the time of death; or

(2) In a survivor's claim, that the miner's death was due to pneumoconiosis.

(d) <u>Rebuttal</u>—(1) <u>Miner's claim</u>.  In a claim filed by a miner, the party opposing entitlement may rebut the presumption by—

(i) Establishing both that the miner does not, or did not, have:

(A) Legal pneumoconiosis as defined in § 718.201(a)(2); and

(B) Clinical pneumoconiosis as defined in § 718.201(a)(1), arising out of coal mine employment (<u>see</u> § 718.203); or

(ii) Establishing that no part of the miner's respiratory or pulmonary total disability was caused by pneumoconiosis as defined in § 718.201.

(2) <u>Survivor's claim</u>.  In a claim filed by a survivor, the party opposing entitlement may rebut the presumption by—

(i) Establishing both that the miner did not have:

(A) Legal pneumoconiosis as defined in § 718.201(a)(2); and

(B) Clinical pneumoconiosis as defined in § 718.201(a)(1), arising out of coal mine employment (<u>see</u> § 718.203); or

(ii) Establishing that no part of the miner's death was caused by pneumoconiosis as defined in § 718.201.

(3) The presumption must not be considered rebutted on the basis of evidence demonstrating the existence of a totally disabling obstructive respiratory or pulmonary disease of unknown origin.

**<u>§ 718.306</u>  [Removed and Reserved]**

54

10. Remove and reserve § 718.306.

11. Revise the introductory text of Appendix C to Part 718 to read as follows:

**Appendix C to Part 718—Blood-Gas Tables.**

The following tables set forth the values to be applied in determining whether total disability may be established in accordance with § 718.204(b)(2)(ii). The values contained in the tables are indicative of impairment only. They do not establish a degree of disability except as provided in § 718.204(b)(2)(ii) of this subchapter, nor do they establish standards for determining normal alveolar gas exchange values for any particular individual. Tests must not be performed during or soon after an acute respiratory or cardiac illness. A miner who meets the following medical specifications must be found to be totally disabled, in the absence of rebutting evidence, if the values specified in one of the following tables are met:

* * * * *

**PART 725—CLAIMS FOR BENEFITS UNDER PART C OF TITLE IV OF THE FEDERAL MINE SAFETY AND HEALTH ACT, AS AMENDED**

12. The authority citation for part 725 continues to read as follows:

Authority: 5 U.S.C. 301; Reorganization Plan No. 6 of 1950, 15 FR 3174; 30 U.S.C. 901 et seq., 902(f), 921, 932, 936; 33 U.S.C. 901 et seq.; 42 U.S.C. 405; Secretary's Order 10-2009, 74 FR 58834.

13. Revise § 725.1 to read as follows:

**§ 725.1  Statutory provisions.**

(a) General.  Subchapter IV of the Federal Coal Mine Health and Safety Act of 1969, as amended by the Black Lung Benefits Act of 1972, the Federal Mine Safety and Health Amendments Act of 1977, the Black Lung Benefits Reform Act of 1977, the

Black Lung Benefits Revenue Act of 1977, the Black Lung Benefits Amendments of
1981, the Black Lung Benefits Revenue Act of 1981, the Black Lung Consolidation of
Responsibility Act of 2002, and the Patient Protection and Affordable Care Act of 2010
(together comprising the Black Lung Benefits Act (<u>see</u> § 725.101(a)(1)) provides for the
payment of benefits to certain disabled coal miners and their survivors.  <u>See</u> § 725.201.

(b) <u>Part B</u>. Part B of subchapter IV of the Act provided that claims filed before
July 1, 1973 were to be filed with, and adjudicated and administered by, the Social
Security Administration (SSA).  If awarded, these claims were paid by SSA out of
appropriated funds.  The Black Lung Consolidation of Administrative Responsibility Act
(<u>see</u> paragraph (h) of this section) transferred all responsibility for continued
administration of these claims to the Department of Labor.

(c) <u>Part C</u>. Claims filed by a miner or survivor on or after January 1, 1974, are
filed, adjudicated, and paid under the provisions of part C of subchapter IV of the Act.
Part C requires that a claim filed on or after January 1, 1974, shall be filed under an
applicable approved State workers' compensation law, or if no such law has been
approved by the Secretary of Labor, the claim may be filed with the Secretary of Labor
under Section 422 of the Act. Claims filed with the Secretary of Labor under part C are
processed and adjudicated by the Secretary.  Individual coal mine operators are primarily
liable for benefits; however, if the miner's last coal mine employment terminated before
January 1, 1970, or if no responsible operator can be identified, benefits are paid by the
Black Lung Disability Trust Fund. Claims adjudicated under part C are subject to certain
incorporated provisions of the Longshore and Harbor Workers' Compensation Act.

(d) Changes made by the Black Lung Benefits Reform Act of 1977.  The Black Lung Benefits Reform Act of 1977 contains a number of significant amendments to the Act's standards for determining eligibility for benefits. Among these are:

(1) A provision which clarifies the definition of "pneumoconiosis" to include any "chronic dust disease of the lung and its sequelae, including respiratory and pulmonary impairments, arising out of coal mine employment";

(2) A provision which defines "miner" to include any person who works or has worked in or around a coal mine or coal preparation facility, and in coal mine construction or coal transportation under certain circumstances;

(3) A provision that continued employment in a coal mine is not conclusive proof that a miner is not or was not totally disabled;

(4) A provision which authorizes the Secretary of Labor to establish standards and develop criteria for determining total disability or death due to pneumoconiosis with respect to a part C claim;

(5) Provisions relating to the treatment to be accorded a survivor's affidavit, certain X-ray interpretations, and certain autopsy reports in the development of a claim; and

(6) Other clarifying, procedural, and technical amendments.

(e) Changes made by the Black Lung Benefits Revenue Act of 1977. The Black Lung Benefits Revenue Act of 1977 established the Black Lung Disability Trust Fund which is financed by a specified tax imposed upon each ton of coal (except lignite) produced and sold or used in the United States after March 31, 1978. The Secretary of the Treasury is the managing trustee of the fund and benefits are paid from the fund upon the

direction of the Secretary of Labor. The fund was made liable for the payment of all claims approved under part C of the Act for all periods of eligibility occurring on or after January 1, 1974, with respect to claims where the miner's last coal mine employment terminated before January 1, 1970, or where individual liability can not be assessed against a coal mine operator due to bankruptcy, insolvency, or the like. The fund was also authorized to pay certain claims which a responsible operator has refused to pay within a reasonable time, and to seek reimbursement from such operator. The purpose of the fund and the Black Lung Benefits Revenue Act of 1977 was to insure that coal mine operators, or the coal industry, will fully bear the cost of black lung disease for the present time and in the future. The Black Lung Benefits Revenue Act of 1977 also contained other provisions relating to the fund and authorized a coal mine operator to establish its own trust fund for the payment of certain claims.

(f) Changes made by the Black Lung Benefits Amendments of 1981. The Black Lung Benefits Amendments of 1981 made a number of significant changes in the Act's standards for determining eligibility for benefits and concerning the payment of such benefits, and applied the changes to claims filed on or after January 1, 1982. Among these are:

(1) The Secretary of Labor may re-read any X-ray submitted in support of a claim and may rely upon a second opinion concerning such an X-ray as a means of auditing the validity of the claim;

(2) The rebuttable presumption that the total disability of a miner with fifteen or more years employment in the coal mines, who has demonstrated a totally disabling respiratory or pulmonary impairment, is due to pneumoconiosis is no longer applicable

(but the presumption was reinstated for claims filed after January 1, 2005, and pending on or after March 23, 2010, by the Patient Protection and Affordable Care Act of 2010 (see paragraph (i) of this section));

(3) In the case of deceased miners, where no medical or other relevant evidence is available, only affidavits from persons not eligible to receive benefits as a result of the adjudication of the claim will be considered sufficient to establish entitlement to benefits;

(4) Unless the miner was found entitled to benefits as a result of a claim filed prior to January 1, 1982, benefits are payable on survivors' claims filed on and after January 1, 1982, only when the miner's death was due to pneumoconiosis (but for survivors' claims filed after January 1, 2005, and pending on or after March 23, 2010, an award of a miner's claim may form the basis for a survivor's entitlement under the Patient Protection and Affordable Care Act of 2010 (see paragraph (i) of this section));

(5) Benefits payable under this part are subject to an offset on account of excess earnings by the miner; and

(6) Other technical amendments.

(g) Changes made by the Black Lung Benefits Revenue Act of 1981. The Black Lung Benefits Revenue Act of 1981 temporarily doubles the amount of the tax upon coal until the fund has repaid all advances received from the United States Treasury and the interest on all such advances. With respect to claims filed on or after January 1, 1982, the fund's authorization for the payment of interim benefits is limited to the payment of prospective benefits only. These changes also define the rates of interest to be paid to and by the fund.

(h) <u>Changes made by the Black Lung Consolidation of Administrative</u>

<u>Responsibility Act</u>.  The Black Lung Consolidation of Administrative Responsibility Act

of 2002 transferred administrative responsibility for all claims previously filed with or

administered by the Social Security Administration to the Department of Labor, effective

January 31, 2003.  As a result, certain obsolete provisions in the BLBA (30 U.S.C. 904,

924a, and 945) were repealed.  Various technical changes were made to other statutory

provisions.

(i) <u>Changes made by the Patient Protection and Affordable Care Act of 2010</u>.

The Patient Protection and Affordable Care Act of 2010 (the ACA) changed the

entitlement criteria for miners' and survivors' claims filed after January 1, 2005, and

pending on or after March 23, 2010, by reinstating two provisions made inapplicable by

the Black Lung Benefits Amendments of 1981.

(1)  For miners' claims meeting these date requirements, the ACA reinstated the

rebuttable presumption that the miner is (or was) totally disabled due to pneumoconiosis

if the miner has (or had) 15 or more years of qualifying coal mine employment and a

totally disabling respiratory or pulmonary impairment.

(2)  For survivors' claims meeting these date requirements, the ACA made two

changes.  First, it reinstated the rebuttable presumption that the miner's death was due to

pneumoconiosis if the miner had 15 years or more of qualifying coal mine employment

and was totally disabled by a respiratory or pulmonary impairment at the time of death.

Second, it reinstituted derivative survivors' entitlement.  As a result, an eligible survivor

will be entitled to benefits if the miner is or was found entitled to benefits on his or her

lifetime claim based on total disability due to pneumoconiosis arising out of coal-mine employment.

(j) <u>Longshore Act provisions</u>. The adjudication of claims filed under part C of the Act (<u>i.e.</u>, claims filed on or after January 1, 1974) is governed by various procedural and other provisions contained in the Longshore and Harbor Workers' Compensation Act (LHWCA), as amended from time to time, which are incorporated within the Act by section 422. The incorporated LHWCA provisions are applicable under the Act except as is otherwise provided by the Act or as provided by regulations of the Secretary. Although occupational disease benefits are also payable under the LHWCA, the primary focus of the procedures set forth in that Act is upon a time-definite-traumatic injury or death. Because of this and other significant differences between a black lung and longshore claim, it is determined, in accordance with the authority set forth in Section 422 of the Act, that certain of the incorporated procedures prescribed by the LHWCA must be altered to fit the circumstances ordinarily confronted in the adjudication of a black lung claim. The changes made are based upon the Department's experience in processing black lung claims since July 1, 1973, and all such changes are specified in this part.  No other departure from the incorporated provisions of the LHWCA is intended.

(k) <u>Social Security Act provisions</u>. Section 402 of Part A of the Act incorporates certain definitional provisions from the Social Security Act, 42 U.S.C. 301 <u>et seq</u>.  Section 430 provides that the 1972, 1977 and 1981 amendments to part B of the Act shall also apply to part C "to the extent appropriate." Sections 412 and 413 incorporate various provisions of the Social Security Act into part B of the Act. To the extent appropriate, therefore, these provisions also apply to part C. In certain cases, the

Department has varied the terms of the Social Security Act provisions to accommodate the unique needs of the black lung benefits program. Parts of the Longshore and Harbor Workers' Compensation Act are also incorporated into part C. Where the incorporated provisions of the two acts are inconsistent, the Department has exercised its broad regulatory powers to choose the extent to which each incorporation is appropriate. Finally, Section 422(g), contained in part C of the Act, incorporates 42 U.S.C. 403(b)-(l).

14. Revise § 725.2 to read as follows:

## § 725.2  Purpose and applicability of this part.

(a) This part sets forth the procedures to be followed and standards to be applied in filing, processing, adjudicating, and paying claims filed under part C of subchapter IV of the Act.

(b) This part applies to all claims filed under part C of subchapter IV of the Act on or after June 30, 1982.  Publication of certain provisions or parts of certain provisions that apply only to claims filed prior to June 30, 1982, or to claims subject to Section 435 of the Act, has been discontinued because those provisions affect an increasingly smaller number of claims.  The version of Part 725 set forth in 20 CFR, parts 500 to end, edition revised as of April 1, 2010, applies to the adjudication of all claims filed prior to June 30, 1982, as appropriate.

(c) The provisions of this part reflect revisions that became effective on January 19, 2001. This part applies to all claims filed after January 19, 2001 and all benefits payments made on such claims. With the exception of the following sections, this part also applies to the adjudication of claims that were pending on January 19, 2001 and all benefits payments made on such claims: §§ 725.101(a)(31), 725.204, 725.212(b),

62

725.213(c), 725.214(d), 725.219(d), 725.309, 725.310, 725.351, 725.360, 725.367,

725.406, 725.407, 725.408, 725.409, 725.410, 725.411, 725.412, 725.414, 725.415,

725.416, 725.417, 725.418, 725.421(b), 725.423, 725.454, 725.456, 725.457, 725.458,

725.459, 725.465, 725.491, 725.492, 725.493, 725.494, 725.495, 725.547, 725.701(e).

The version of those sections set forth in 20 CFR, parts 500 to end, edition revised as of

April 1, 1999, apply to the adjudications of claims that were pending on January 19,

2001. For purposes of construing the provisions of this section, a claim will be considered

pending on January 19, 2001 if it was not finally denied more than one year prior to that

date

    15.  In § 725.101, revise paragraphs (a)(1), (a)(2), (a)(4), (a)(32)(i) through (iv),

and (b) to read as follows:

## § 725.101  Definition and use of terms.

    (a) * * *

    (1)  The <u>Act</u> means the Black Lung Benefits Act, 30 U.S.C. 901-44, as

amended.

    (2)  The <u>Longshore Act</u> or <u>LHWCA</u> means the Longshore and Harbor Workers'

Compensation Act, 33 U.S.C. 901-950, as amended from time to time.

* * * * *

    (4)  <u>Administrative law judge</u> means a person qualified under <u>5 U.S.C. 3105</u> to

conduct hearings and adjudicate claims for benefits filed pursuant to section 415 and part

C of the Act.  Until March 1, 1979, it also means an individual appointed to conduct such

hearings and adjudicate such claims under Public Law 94–504.

* * * * *

(32) * * *

(i) If the evidence establishes that the miner worked in or around coal mines at least 125 working days during a calendar year or partial periods totaling one year, then the miner has worked one year in coal mine employment for all purposes under the Act. If a miner worked fewer than 125 working days in a year, he or she has worked a fractional year based on the ratio of the actual number of days worked to 125. Proof that the miner worked more than 125 working days in a calendar year or partial periods totaling a year, does not establish more than one year.

(ii) To the extent the evidence permits, the beginning and ending dates of all periods of coal mine employment must be ascertained. The dates and length of employment may be established by any credible evidence including (but not limited to) company records, pension records, earnings statements, coworker affidavits, and sworn testimony. If the evidence establishes that the miner's employment lasted for a calendar year or partial periods totaling a 365-day period amounting to one year, it must be presumed, in the absence of evidence to the contrary, that the miner spent at least 125 working days in such employment.

(iii) If the evidence is insufficient to establish the beginning and ending dates of the miner's coal mine employment, or the miner's employment lasted less than a calendar year, then the adjudication officer may use the following formula: divide the miner's yearly income from work as a miner by the coal mine industry's average daily earnings for that year, as reported by the Bureau of Labor Statistics (BLS). A copy of the BLS table must be made a part of the record if the adjudication officer uses this method to establish the length of the miner's work history.

(iv) Periods of coal mine employment occurring outside the United States must not be considered in computing the miner's work history.

(b) <u>Statutory terms</u>. The definitions contained in this section must not be construed in derogation of terms of the Act.

* * * * *

16.  In § 725.201:

a.  Revise paragraph (a);

b.  Remove paragraph (b); and

c.  Redesignate paragraphs (c) and (d) as paragraphs (b) and (c).

The revision reads as follows:

**<u>§ 725.201  Who is entitled to benefits; contents of this subpart.</u>**

(a)  Part C of the Act provides for the payment of periodic benefits in accordance with this part to:

(1)  A miner who meets the conditions of entitlement set forth in § 725.202(d); or

(2)  The surviving spouse or surviving divorced spouse of a deceased miner who meets the conditions of entitlement set forth in § 725.212; or,

(3)  Where neither exists, the child of a deceased miner who meets the conditions of entitlement set forth in § 725.218; or

(4)  The surviving dependent parents, where there is no surviving spouse or child, or the surviving dependent brothers or sisters, where there is no surviving spouse, child, or parent, of a miner, who meet the conditions of entitlement set forth in § 725.222; or

(5)  The child of a miner's surviving spouse who was receiving benefits under Part C of the Act at the time of such spouse's death.

* * * * *

17.  In § 725.212, republish paragraph (a)(3) introductory text and revise paragraphs (a)(3)(i) and (ii) to read as follows:

**§ 725.212  Conditions of entitlement; surviving spouse or surviving divorced spouse.**

(a) * * *

(3) The deceased miner either:

(i) Is determined to have died due to pneumoconiosis; or

(ii) Filed a claim for benefits on or after January 1, 1982, which results or resulted in a final award of benefits, and the surviving spouse or surviving divorced spouse filed a claim for benefits after January 1, 2005 which was pending on or after March 23, 2010.

* * * * *

18.  In § 725.218, republish paragraph (a) introductory text and revise paragraphs (a)(1) and (2) to read as follows:

**§ 725.218  Conditions of entitlement; child.**

(a) An individual is entitled to benefits where he or she meets the required standards of relationship and dependency under this subpart (see § 725.220 and § 725.221) and is the child of a deceased miner who:

(1) Is determined to have died due to pneumoconiosis; or

(2) Filed a claim for benefits on or after January 1, 1982, which results or resulted in a final award of benefits, and the surviving child filed a claim for benefits after January 1, 2005 which was pending on or after March 23, 2010.

* * * * *

19.  In § 725.222, republish paragraph (a)(5) introductory text and revise paragraphs (a)(5)(i) and (ii) to read as follows:

**§ 725.222  Conditions of entitlement; parent, brother or sister.**

(a) * * *

(5)  The deceased miner:

(i)  Is determined to have died due to pneumoconiosis; or

(ii)  Filed a claim for benefits on or after January 1, 1982, which results or resulted in a final award of benefits, and the surviving parent, brother or sister filed a claim for benefits after January 1, 2005 which was pending on or after March 23, 2010.

* * * * *

20.  Revise § 725.309 to read as follows:

**§ 725.309  Additional claims; effect of prior denial of benefits.**

(a) If a claimant files a claim under this part while another claim filed by the claimant under this part is still pending, the later claim must be merged with the earlier claim for all purposes. For purposes of this section, a claim must be considered pending if it has not yet been finally denied.

(b) If a claimant files a claim under this part within one year after the effective date of a final order denying a claim previously filed by the claimant under this part (see § 725.502(a)(2)), the later claim must be considered a request for modification of the prior denial and will be processed and adjudicated under § 725.310.

(c) If a claimant files a claim under this part more than one year after the effective date of a final order denying a claim previously filed by the claimant under this part (see § 725.502(a)(2)), the later claim must be considered a subsequent claim for benefits.  A

67

subsequent claim will be processed and adjudicated in accordance with the provisions of subparts E and F of this part.  Except as provided in paragraph (1) below, a subsequent claim must be denied unless the claimant demonstrates that one of the applicable conditions of entitlement (see §§ 725.202(d) (miner), 725.212 (spouse), 725.218 (child), and 725.222 (parent, brother, or sister)) has changed since the date upon which the order denying the prior claim became final.  The applicability of this paragraph may be waived by the operator or fund, as appropriate. The following additional rules apply to the adjudication of a subsequent claim:

(1)  The requirement to establish a change in an applicable condition of entitlement does not apply to a survivor's claim if the requirements of §§ 725.212(a)(3)(ii), 725.218(a)(2), or 725.222(a)(5)(ii) are met, and the survivor's prior claim was filed—

(i)  On or before January 1, 2005, or

(ii)  After January 1, 2005 and was finally denied prior to March 23, 2010.

(2)  Any evidence submitted in connection with any prior claim must be made a part of the record in the subsequent claim, provided that it was not excluded in the adjudication of the prior claim.

(3)  For purposes of this section, the applicable conditions of entitlement are limited to those conditions upon which the prior denial was based. For example, if the claim was denied solely on the basis that the individual was not a miner, the subsequent claim must be denied unless the individual worked as a miner following the prior denial. Similarly, if the claim was denied because the miner did not meet one or more of the eligibility criteria contained in part 718 of this subchapter, the subsequent claim must be

68

denied unless the miner meets at least one of the criteria that he or she did not meet previously.

(4)  If the applicable condition(s) of entitlement relate to the miner's physical condition, the subsequent claim may be approved only if new evidence submitted in connection with the subsequent claim establishes at least one applicable condition of entitlement.  A subsequent claim filed by a surviving spouse, child, parent, brother, or sister must be denied unless the applicable conditions of entitlement in such claim include at least one condition unrelated to the miner's physical condition at the time of his death.

(5)  If the claimant demonstrates a change in one of the applicable conditions of entitlement, no findings made in connection with the prior claim, except those based on a party's failure to contest an issue (see § 725.463), will be binding on any party in the adjudication of the subsequent claim. However, any stipulation made by any party in connection with the prior claim will be binding on that party in the adjudication of the subsequent claim.

(6)  In any case in which a subsequent claim is awarded, no benefits may be paid for any period prior to the date upon which the order denying the prior claim became final.

(d)  In any case involving more than one claim filed by the same claimant, under no circumstances are duplicate benefits payable for concurrent periods of eligibility. Any duplicate benefits paid will be subject to collection or offset under subpart H of this part.

21.  Revise § 725.418 to read as follows:

**§ 725.418  Proposed decision and order.**

69

(a) Within 20 days after the termination of all informal conference proceedings, or, if no informal conference is held, at the conclusion of the period permitted by § 725.410(b) for the submission of evidence, the district director will issue a proposed decision and order.  A proposed decision and order is a document, issued by the district director after the evidentiary development of the claim is completed and all contested issues, if any, are joined, which purports to resolve a claim on the basis of the evidence submitted to or obtained by the district director.  A proposed decision and order will be considered a final adjudication of a claim only as provided in § 725.419.  A proposed decision and order may be issued by the district director at any time during the adjudication of any claim if:

(1) Issuance is authorized or required by this part;

(2) The district director determines that its issuance will expedite the adjudication of the claim; or

(3) The district director determines that the claimant is a survivor who is entitled to benefits under 30 U.S.C. 932(l).  In such cases, the district director may designate the responsible operator in the proposed decision and order regardless of whether the requirements of paragraph (d) of this section have been met.  Any operator identified as liable for benefits under this paragraph may challenge the finding of liability by timely requesting revision of the proposed decision and order and specifically indicating disagreement with that finding.  See 20 CFR 725.419(a) and (b).  In such cases, the district director must allow all parties 30 days within which to submit liability evidence. At the end of this period, the district director must issue a new proposed decision and order.

70

(b) A proposed decision and order must contain findings of fact and conclusions of law. It must be served on all parties to the claim by certified mail.

(c) The proposed decision and order must contain a notice of the right of any interested party to request a formal hearing before the Office of Administrative Law Judges. If the proposed decision and order is a denial of benefits, and the claimant has previously filed a request for a hearing, the proposed decision and order must notify the claimant that the case will be referred for a hearing pursuant to the previous request unless the claimant notifies the district director that he no longer desires a hearing. If the proposed decision and order is an award of benefits, and the designated responsible operator has previously filed a request for a hearing, the proposed decision and order must notify the operator that the case will be referred for a hearing pursuant to the previous request unless the operator notifies the district director that it no longer desires a hearing.

(d) The proposed decision and order must reflect the district director's final designation of the responsible operator liable for the payment of benefits. Except as provided in paragraph (a)(3) of this section, no operator may be finally designated as the responsible operator unless it has received notification of its potential liability pursuant to § 725.407, and the opportunity to submit additional evidence pursuant to § 725.410.  The district director must dismiss, as parties to the claim, all other potentially

liable operators that received notification pursuant to § 725.407 and that were not

previously dismissed pursuant to § 725.410(a)(3).

Signed at Washington, DC, this 16th day of September, 2013.

Gary A. Steinberg,

Acting Director, Office of Workers' Compensation Programs

Billing Code 4510-CK-P

[FR Doc. 2013-22874 Filed 09/24/2013 at 8:45 am; Publication Date: 09/25/2013]